# NATIONAL ASSOCIATION OF GREETING CARD PUBLISHERS *v.* UNITED STATES POSTAL SERVICE ET AL.

No. 81–1304.   Argued December 1, 1982—Decided June 22, 1983*

---

*Together with No. 81–1381, *United Parcel Service of America, Inc.* v. *United States Postal Service et al.*, also on certiorari to the same court.

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Matthew S. Perlman* argued the cause for petitioner in No. 81–1304. With him on the briefs was *Richard J. Webber. Bernard G. Segal* argued the cause for petitioner in No. 81–1381. With him on the briefs were *Robert L. Kendall, Jr., James D. Crawford,* and *John E. McKeever.*

*John H. Garvey* argued the cause for respondents in both cases. With him on the brief for the United States Postal Service were *Solicitor General Lee* and *Deputy Solicitor General Geller. Robert A. Saltzstein, Stephen M. Feldman,* and *Joseph J. Saunders* filed a brief for respondent American Business Press. *Dana T. Ackerly* and *Charles Lister* filed briefs for respondent Direct Mail/Marketing Association, Inc. *Raymond N. Shibley, Michael F. McBride,* and *W. Gilbert Faulk, Jr.,* filed a brief for respondent Dow Jones & Co., Inc. *David C. Todd* and *Timothy J. May* filed a brief for respondents Mail Order Association of America et al. *David Minton* filed a brief for respondent Magazine Publishers Association, Inc. *Alan R. Swendiman* and *William J. Olson* filed a brief for respondents March of Dimes Birth Defects Foundation et al. *Toni K. Allen, Robert M. Lichtman,* and *John M. Burzio* filed a brief for respondents Newsweek, Inc., et al. *Ian D. Volner, Richard M. Schmidt, Jr.,* and *Mark L. Pelesh* filed a brief for respondents Recording Industry Association of America et al.†

JUSTICE BLACKMUN delivered the opinion of the Court.

These cases arise out of the most recent general postal ratemaking proceeding, the fifth under the Postal Reorganization Act. At issue is the extent to which the Act requires the responsible federal agencies to base postal rates on cost-of-service principles.

---

†*W. Terry Maguire, Pamela Riley,* and *Arthur B. Sackler* filed a brief for the American Newspaper Publishers Association et al. as *amici curiae* urging affirmance.

# I

## A

When, in 1970, Congress enacted the Postal Reorganiza-
tion Act (Act), 39 U. S. C. § 101 *et seq.*, it divested itself of
the control it theretofore had exercised over the setting of
postal rates and fees. The Act abolished the Post Office
Department, which since 1789 had administered the Na-
tion's mails. See Act of Sept. 22, 1789, ch. 16, 1 Stat. 70.
In its place, the Act established the United States Postal
Service as an independent agency under the direction of an
11-member Board of Governors. 39 U. S. C. §§ 201, 202.[1]
The Act also established a five-member Postal Rate Commis-
sion (Rate Commission) as an agency independent of the
Postal Service. § 3601.

Basic to the Act is the principle that, to the extent "practi-
cable," the Postal Service's total revenue must equal its
costs. § 3621. Guided by this principle, the Board of Gov-
ernors, when it deems it in the public interest, may request
the Rate Commission to recommend a new rate schedule.
§ 3622. After receiving the request, the Rate Commission
holds hearings, § 3624(a), and formulates a schedule, § 3624
(d). Section 3622(b) provides that the Rate Commission
shall recommend rates for the classes of mail[2] in accordance
with nine factors, the third of which is "the requirement that
each class of mail or type of mail service bear the direct and
indirect postal costs attributable to that class or type plus
that portion of all other costs of the Postal Service rea-

---

[1] All citations to statutes herein refer to provisions of Title 39 of the
United States Code.

[2] The Postal Service and Rate Commission classify the various types of
mail through a process similar to that governing ratesetting. See §§ 3623,
3625. Presently, the four broad classes of mail are first class (letters, post
cards, and small sealed parcels), second class (newspapers, magazines, and
other periodicals), third class (single piece service for small parcels, cata-
logues, and other items, and certain bulk mail services), and fourth class
(primarily parcel post). See Brief for United States Postal Service 4, n. 4.

sonably assignable to such class or type."[3] The Governors may approve the recommended rate schedule, may allow it under protest, may reject it, or, in limited circumstances, may modify it. § 3625. The Governors' decision to order new rates into effect may be appealed to any United States court of appeals. § 3628.

Questions confronting us in these cases are whether the Rate Commission must follow a two-tier or a three-tier process in setting rates, and the extent to which the Rate Commission must base rates on estimates of the costs caused by providing each class of mail service.

B

In its first two ratemaking proceedings under the Act, the Rate Commission determined that § 3622(b) establishes a

---

[3] Section 3622(b) provides in relevant part:

"(b) Upon receiving a request [from the Postal Service], the [Rate] Commission shall make a recommended decision . . . in accordance with the policies of this title and the following factors:

"(1) the establishment and maintenance of a fair and equitable schedule;

"(2) the value of the mail service actually provided each class or type of mail service to both the sender and the recipient, including but not limited to the collection, mode of transportation, and priority of delivery;

"(3) the requirement that each class of mail or type of mail service bear the direct and indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type;

"(4) the effect of rate increases upon the general public, business mail users, and enterprises in the private sector of the economy engaged in the delivery of mail matter other than letters;

"(5) the available alternative means of sending and receiving letters and other mail matter at reasonable costs;

"(6) the degree of preparation of mail for delivery into the postal system performed by the mailer and its effect upon reducing costs to the Postal Service;

"(7) simplicity of structure for the entire schedule and simple, identifiable relationships between the rates or fees charged the various classes of mail for postal services;

"(8) the educational, cultural, scientific, and informational value to the recipient of mail matter; and

"(9) such other factors as the Commission deems appropriate."

two-tier approach to allocating the Postal Service's total revenue requirement. See Postal Rate Commission, Opinion and Recommended Decision, Docket No. R74–1, pp. 4, 91–93 (1975);[4] PRC Op. R71–1, pp. 39–41 (1972). Under this approach, the Rate Commission first must determine the costs caused by ("attributable to") each class of mail, § 3622(b)(3), and on that basis establish a rate floor for each class. PRC Op. R74–1, pp. 92, 93, 110. The Rate Commission then must "reasonably assign," see § 3622(b)(3), the remaining costs to the various classes of mail on the basis of the other factors set forth in § 3622(b). See PRC Op. R74–1, pp. 91–94.

In the first proceeding, the Rate Commission concluded that the Act does not dictate the use of any particular method of identifying the costs caused by each class. PRC Op. R71–1, pp. 42–47. Without committing itself to any theory for the future, it chose to attribute those costs shown to vary with the volume of mail in each class over the "short term"—the period of a single year.[5] Although it considered other methods, it found the short-term approach to be the only feasible one, given the limited data developed by the Postal Service. Id., at 47–62.

In the second proceeding, the Rate Commission again viewed the choice of a costing system as within its discretion. PRC Op. R74–1, pp. 92–93, 127. Although the Postal Service contended that short-term costs should again control attribution, the Rate Commission determined that it could reliably attribute more costs through a long-term variable costing analysis. That method attributes costs by identifying cost variations associated with shifts in mail volume and with shifts in the Postal Service's capacity to handle mail

---

[4] Opinions and Recommended Decisions of the Rate Commission are cited herein as "PRC Op.," followed by the docket number.

[5] In addition to variable costs, the Rate Commission consistently has attributed fixed costs incurred for the benefit of a single class. See PRC Op. R74–1, p. 76; PRC Op. R80–1, App. B, p. 52 (1981). These "specific fixed costs" constitute a small percentage of all costs. See Brief for United States Postal Service 6, n. 9.

over periods of time longer than one year. *Id.*, at 111–112, 126–127. The Rate Commission did not go beyond attributing long-run variable costs, because the statute forbids attribution based on guesswork, see *id.*, at 110–111, and because the Rate Commission was unable to find "any other reliable principle of causality on [the] record," *id.*, at 94. The Rate Commission urged the development of improved data for future proceedings, so that it could identify more causal relationships, and thereby attribute more costs. *Id.*, at 110–111.[6]

## C

Reviewing the second proceeding, the United States Court of Appeals for the District of Columbia Circuit rejected the Rate Commission's approach. *National Assn. of Greeting Card Publishers* v. *USPS*, 186 U. S. App. D. C. 331, 569 F. 2d 570 (1976) *(NAGCP I)*, vacated on other grounds, 434 U. S. 884 (1977). The court held that the Act's principal goals of eliminating price discrimination among classes of mail and curtailing discretion in ratesetting, 186 U. S. App. D. C., at 348–350, 569 F. 2d, at 587–589, require the Rate Commission "to employ cost-of-service principles to the fullest extent possible." *Id.* at 354, 569 F. 2d, at 593; see *id.*, at 348, 569 F. 2d, at 587. Therefore, the court stated, the Act mandates not only attribution of variable costs, but also "extended attribution" of costs that, "although not measurably variable," can reasonably be determined to result from handling each class of mail. *Id.*, at 347, 569 F. 2d, at 586. The court required the Rate Commission to allocate some costs on the basis of "cost accounting principles." *Id.*, at 344, 569 F. 2d, at 583; see *id.*, at 347, 352, 569 F. 2d, at 586, 591. This involves apportioning costs on the basis of "distri-

---

[6] The Rate Commission attributed 50% of the Postal Service's total revenue requirement in the first proceeding, see App. 239a, and in the second the data provided by the Postal Service had improved enough to support a rate floor consisting of 52.5% of total postal costs. See PRC Op. R80–1, App. B, p. 28.

bution keys," such as the weight or cubic volume of mail, notwithstanding the lack of proof that such factors play a causative role. *Id.*, at 344, 352, 569 F. 2d, at 583, 591.[7]

The Court of Appeals, citing the language and purposes of the statute, also required the Rate Commission to follow a three-tier, rather than a two-tier, procedure in setting rates. In the court's view, the first two tiers—attribution and assignment—are to proceed on a cost-of-service basis.[8] *Id.*, at 347, and n. 59, 353–354, 569 F. 2d, at 586, and n. 59, 592–593. Only those "residual costs" that cannot be attributed or assigned on the basis of reasonable inferences of causation may be distributed, in the third tier, among the classes of mail on the basis of § 3622(b)'s noncost, discretionary factors. *Id.*, at 348, 569 F. 2d, at 587.

Despite its doubts about *NAGCP I,* PRC Op. R77–1, p. 9 (1978), the Rate Commission attempted to comply in the fourth ratemaking proceeding.[9] It adhered to its view that variability is the key to attribution, because only with "some showing of volume variability over the long run" could it have reasonable confidence that particular costs were the consequence of providing the service. *Id.*, at 84. Because the data on long-run costs had improved, the Rate Commission

---

[7] Such accounting principles are used in utility ratemaking proceedings that employ "fully allocated costing" systems. Under such systems, a specific cause is assigned to every cost incurred by a utility. The Post Office employed such a system prior to the Act. See *infra,* at 827, and n. 22.

[8] The court said that attributable and assignable costs are distinguishable in that "the latter concept permits a greater degree of estimation and connotes somewhat more judgment and discretion than the former." 186 U. S. App. D. C., at 348, n. 59, 569 F. 2d, at 588, n. 59.

[9] Challenges to the third ratemaking proceeding, Docket No. R76–1, which was completed prior to the Court of Appeals' decision in *NAGCP I,* see 186 U. S. App. D. C., at 339, n. 21, 569 F. 2d, at 578, n. 21, were dismissed as moot because they still were pending when the administrative decisions in the fourth ratemaking proceeding were complete. *National Assn. of Greeting Card Publishers* v. *USPS,* No. 76–1611 (CADC June 27, 1978) *(NAGCP II)* (order).

found that its long-run analysis satisfied *NAGCP I*'s require-
ment of "extended attribution" without resort to mere "infer-
ences of causation." PRC Op. R77–1, at 10, 85.[10]

Turning to the intermediate assignment tier created by
*NAGCP I*, the Rate Commission found a group of nonvari-
able "Service Related Costs" to be reasonably assignable to
first-class and certain categories of second-class mail. Serv-
ice Related Costs were defined as the fixed delivery costs in-
curred in maintaining the current 6-day-a-week delivery
schedule for those classes, rather than a hypothetical 3-day-a-
week schedule.[11] See PRC Op. R77–1, at 87–124.

## D

The current controversy began on April 21, 1980, when the
Postal Service requested from the Rate Commission a fifth
increase in postal rates. Following extensive hearings, the
Rate Commission recommended continued assignment of
Service Related Costs in order to comply with the Court
of Appeals' three-tier approach, see PRC Op. R80–1,
pp. 145–156, despite the Postal Service's rejection of the con-
cept, see Decision of the Governors of the United States
Postal Service on Rates of Postage and Fees for Postal Serv-
ices, March 10, 1981, App. to Pet. for Cert. 13b–14b (Decision
of the Governors). The Rate Commission also made clear that
while it did not consider variability analysis to be the sole

---

[10] By this method, the Rate Commission attributed almost 65% of total
costs. PRC Op. R77–1, p. 156 (table).

[11] The Rate Commission concluded that these nonvariable costs consti-
tuted slightly over 7% of the Postal Service's total revenue requirement.

On the assumption that the Postal Service and the Rate Commission
would continue to improve and extend their attribution and assignment
techniques, the District of Columbia Circuit affirmed the Governors' deci-
sion to put into effect the Rate Commission's recommendations. See *Na-
tional Assn. of Greeting Card Publishers* v. *USPS*, 197 U. S. App. D. C.
78, 82–104, 607 F. 2d 392, 396–418 (1979) (opinion of Leventhal, J.)
*(NAGCP III)*, cert. denied, 444 U. S. 1025 (1980).

statutory basis for attribution, only long-run variability analysis had been shown to be accurate enough to permit attribution. PRC Op. R80–1, pp. 129–131, 140, and n. 2.[12] The Governors, under protest, permitted these rates to go into effect.[13]

On petitions for review, the United States Court of Appeals for the Second Circuit held that Congress had not intended to require the maximum possible use of cost-of-service principles in postal ratesetting. *Newsweek, Inc.* v. *USPS*, 663 F. 2d 1186 (1981). The Second Circuit stated that although the Rate Commission is free to use the approach the District of Columbia Circuit had required, the Act permits the use of other approaches as well, including the Rate Commission's original two-tier approach to ratesetting. Under the Second Circuit's construction, § 3622(b)(3) requires that the rate floor for each class consist of attributable costs based, at a minimum, on short-term variability; reasonable assignment may proceed on the basis of the other factors set forth in § 3622(b). The court remanded to the agencies for reconsideration.

[12] More than 64% of total costs were attributed by this method. PRC Op. R80–1, p. 222 (table).

[13] Decision of the Governors, App. to Pet. for Cert. 1b. The Governors also returned the matter to the Rate Commission for reconsideration. After the Rate Commission twice substantially reaffirmed its recommendations, the Governors exercised their statutory authority to modify the decision, § 3625(d), by, among other changes, abandoning the Service Related Costs concept. See Decision of the Governors Under 39 U. S. C. Section 3625 in the Matter of Proposed Changes in Postal Rates and Fees, Docket No. R80–1 Before the Postal Rate Commission (Sept. 29, 1981). This modification was appealed to the United States Court of Appeals for the Second Circuit, which remanded to the Governors for further explanation of their reasoning. *Time, Inc.* v. *USPS*, 685 F. 2d 760 (1982). The Governors complied with the remand, Further Explanation and Justification Supporting the September 29, 1981 Decision of the Governors of the United States Postal Service on Rates of Postage and Fees for Postal Services (Dec. 20, 1982), and the Second Circuit recently denied petitions for review. *Time, Inc.* v. *USPS*, Nos. 81–4183, 81–4185, 81–4203, 81–4205, and 81–6216 (June 8, 1983). These matters are not before us.

Because of the inconsistencies in the holdings of the Second and District of Columbia Circuits, we granted certiorari. 456 U. S. 925 (1982).[14]

## II

As a threshold matter, it is useful to set forth what is, and what is not, at issue in this litigation. Of the factors set forth in § 3622(b), only subsection (b)(3) is styled a "requirement." With the approval of both Courts of Appeals, the Rate Commission has concluded that notwithstanding its placement as the third of nine factors, this distinction dictates that "attribution" and "assignment" define the framework for ratesetting. In addition, the Rate Commission takes the view that "causation is both the statutory and the logical basis for attribution." PRC Op. R74–1, p. 110. The parties do not dispute these premises, and we see no reason to question them.

At issue is the Rate Commission's consistent position that the Act establishes a two-tier structure for ratesetting, and that the Act does not dictate or exclude the use of any method of attributing costs, but requires that all costs reliably identifiable with a given class, by whatever method, be attributed to that class.[15] An agency's interpretation of its

[14] The Governors' subsequent decision to modify the rates at issue, see n. 13, *supra*, has not mooted the controversy. Postal rates frequently are in effect too briefly for litigation concerning them to be completed before they are superseded. See *Reeves, Inc.* v. *Stake*, 447 U. S. 429, 434, n. 5 (1980). Before judicial review of the second and third ratemaking proceedings could be concluded, for example, new rates resulting from the third and fourth ratemaking proceedings had gone into effect. See *NAGCP I*, 186 U. S. App. D. C., at 339, n. 21, 569 F. 2d, at 578, n. 21; *NAGCP III*, 197 U. S. App. D. C., at 82, n. 3, 607 F. 2d, at 396, n. 3. The questions before the Court are certain to be central to future proceedings, and there is more than a "reasonable expectation" that petitioners, who have taken part in most or all of the challenges to prior rate schedules, will be affected by these future proceedings. See *Weinstein* v. *Bradford*, 423 U. S. 147, 149 (1975); *Reeves, Inc.* v. *Stake*, 447 U. S., at 434, n. 5; *Murphy* v. *Hunt*, 455 U. S. 478, 482 (1982).

[15] The Rate Commission is not a party to this action. We are informed that the Rate Commission agrees with the Postal Service that the decision

enabling statute must be upheld unless the interpretation is contrary to the statutory mandate or frustrates Congress' policy objectives. *FEC* v. *Democratic Senatorial Campaign Committee*, 454 U. S. 27, 32 (1981). Although the Postal Reorganization Act divides ratemaking responsibility between two agencies, the legislative history demonstrates "that ratemaking . . . authority [was] vested primarily in [the] Postal Rate Commission." S. Rep. No. 91–912, p. 4 (1970) (Senate Report); see *Time, Inc.* v. *USPS*, 685 F. 2d 760, 771 (CA2 1982); *Newsweek, Inc.* v. *USPS*, 663 F. 2d, at 1200–1201; *NAGCP III*, 197 U. S. App. D. C., at 87, 607 F. 2d, at 401. The structure of the Act supports this view.[16] While the Postal Service has final responsibility for guaranteeing that total revenues equal total costs, the Rate Commission determines the proportion of the revenue that should be raised by each class of mail. In so doing, the Rate Commission applies the factors listed in § 3622(b). Its interpretation of that statute is due deference. See *Time, Inc.* v. *USPS*, 685 F. 2d, at 771; *United Parcel Service, Inc.* v. *USPS*, 604 F. 2d 1370, 1381 (CA3 1979), cert. denied, 446 U. S. 957 (1980).

## III

In *NAGCP I,* the Court of Appeals for the District of Columbia Circuit discerned in the Act an overriding purpose to minimize the Rate Commission's discretion by maximizing the use of cost-of-service principles. According to the Court of Appeals, the Rate Commission's failure to use "cost ac-

---

of the Second Circuit is correct and should be affirmed. Brief for United States Postal Service 49, n. 46. We do not understand this statement to indicate that the Rate Commission agrees with all the reasoning in the Postal Service's brief, or that it has abandoned the consistent reading it has given the Act in the first five ratemaking proceedings.

[16] It is the Rate Commission, not the Postal Service, that conducts extensive hearings, § 3624, and applies the ratemaking factors enumerated in § 3622(b). The Postal Service may modify a Rate Commission recommendation only if the recommended rates will not produce revenues equal to the Postal Service's estimated costs. § 3625(d)(2).

counting principles" to attribute costs, and its failure to "assign" costs on the basis of extended inferences of causation as a middle ratesetting tier, frustrated these congressional goals. Animating the court's view was the fact that Congress, in passing the Act, was disturbed about the influence of lobbyists on Congress' discretionary ratemaking and the resulting discrimination in rates among classes of postal service; in the Act, Congress sought to "get 'politics out of the Post Office.'" 186 U. S. App. D. C., at 349, 569 F. 2d, at 588 (quoting H. R. Rep. No. 91–1104, p. 6 (1970) (House Report)).

Without doubt, Congress did have these problems in mind, but we agree with the Second Circuit that the District of Columbia Circuit misunderstood Congress' solution. See 663 F. 2d, at 1198. Congress did not eliminate the ratesetter's discretion; it simply removed the ratesetting function from the political arena by removing postal funding from the budgetary process, see § 3621 (Postal Service is to be self-supporting), and by removing the Postal Service's principal officers from the President's direct control. House Report, at 6, 12, 13, 18–19; Senate Report, at 8. In addition, Congress recognized that the increasing economic, accounting, and engineering complexity of ratemaking issues had caused Members of Congress, "lacking the time, training, and staff support for thorough analysis," to place too much reliance on lobbyists. House Report, at 18. Consequently, it attempted to remove undue price discrimination and political influence by placing ratesetting in the hands of a Rate Commission, composed of "professional economists, trained rate analysts, and the like," *id.*, at 5, independent of Postal Service management, *id.*, at 13, and subject only to Congress' "broad policy guidelines," *id.*, at 12. Congress sought to ensure that the Postal Service would be managed "in a businesslike way." *Id.*, at 5; see *id.*, at 11–12. There is no suggestion in the legislative history that Congress viewed the exercise of discretion as an evil in itself. Congress simply

wished to substitute the educated and politically insulated discretion of experts for its own.

## IV

We turn now to the narrower contentions about the meaning of § 3622(b)(3). In determining whether the Rate Commission's two-tier approach to ratesetting is contrary to the mandate of the Act or frustrates its policies, we begin with the statute's language. See *North Dakota* v. *United States*, 460 U. S. 300, 312 (1983); *Dickerson* v. *New Banner Institute, Inc.*, 460 U. S. 103, 110 (1983). Once the Rate Commission has allocated all attributable costs, § 3622(b)(3) directs that each class must bear, in addition, "that portion of all other costs . . . reasonably assignable" to it. While the verb "attribute" primarily connotes causation, the verb "assign" connotes distribution on any basis. On its face, therefore, the section suggests one ratemaking tier based on causation, and a second based on other factors. We see no justification for the interposition of an intermediate causation-based assignment tier.[17] The Rate Commission's two-tier approach is consistent with the statutory language.

Moreover, the legislative history supports the Rate Commission's approach. The report of the President's Commission on Postal Organization (Kappel Commission) found that

---

[17] The District of Columbia Circuit read the statute to require an intermediate "assignment" tier that, like attribution, must be based on causation principles. The court believed that "Congress did not intend that *all* postal costs be either attributed or assigned," because some unattributable postal costs "will exist but will not be 'reasonably assignable' to any particular class or type." *NAGCP I*, 186 U. S. App. D. C., at 348, 569 F. 2d, at 587 (emphasis in original). This followed, the court believed, from the section's requirement that each class bear "only 'that portion of all other costs . . . reasonably assignable.'" *Ibid.*, quoting § 3622(b)(3) (the District of Columbia Circuit's emphasis deleted). But § 3622(b)(3) does not provide that only a portion of all other costs is to be assigned. It says, instead, that through the process of assignment each class of service will receive its reasonable portion of all other costs.

it would be unfair to require the users of one class of service to pay for expenditures demonstrably related to another class. See Kappel Commission, Towards Postal Excellence: The Report of the President's Commission on Postal Organization 130 (1968) (Kappel Commission Report). But, on the basis of detailed studies of the Post Office, the report concluded that "[a] large segment of postal costs . . . does not result from handling a particular class of mail but is the cost of maintaining the postal system itself." *Id.*, at 30. The Kappel Commission proposed a two-tier ratemaking process, very similar to the Rate Commission's approach,[18] to allocate among the classes of mail these two groups of costs.

The House version of § 3622(b)(3) closely followed the Kappel Commission's proposal, see House Report, at 6, directing the establishment of rates "so that at least those costs demonstrably related to the class of service in question will be borne by each such class and not by other classes of users of postal services or by the mails generally." H. R. 17070, 91st Cong., 2d Sess., § 1201(c) (1970). Although the House bill did not address the criteria that would govern distribution of the remaining costs among the various classes of mail, there was no suggestion of a second, more attenuated, causation-based tier as required by the District of Columbia Circuit.

The Senate bill, although not expressly calling for a rate floor for each class, required the Rate Commission to consider among other factors "operating costs, the amount of overhead, and other institutional costs of the Postal Service properly assignable to each class of mail." S. 3842, 91st Cong., 2d Sess., § 3704(g)(3) (1970). The Senate bill's use of the word "assignable," which the District of Columbia Circuit believed mandated a causation-based "assignment" tier, see *NAGCP I*, 186 U. S. App. D. C., at 347, n. 59, 569 F. 2d, at

---

[18] First, rates for each class of mail "would cover the costs demonstrably related to that class of service." Second, "[r]emaining institutional costs" · would be apportioned to the various classes on the basis of market factors, not causation. Kappel Commission Report, at 61–62; see *id.*, at 130–132.

586, n. 59, does not undercut the reasonableness of the Rate Commission's construction. There is no suggestion either in this language or elsewhere in the legislative history that the Senate envisioned a three-tier approach. In fact, the Senate Report accompanying the bill suggested a two-tier approach, allocating some costs on cost-of-service principles, and allocating other costs through consideration of the overall value of the service provided and other factors. See Senate Report, at 11.

As discussed above, the language of the compromise bill enacted into law is fully consistent with a two-tier structure, and there is no legislative history to the contrary. We conclude that the Rate Commission's two-tier approach is a reasonable construction of § 3622(b)(3).[19]

## V

We now turn to the nature of the first tier, the statutory requirement of attribution.

## A

The Court has observed: "Allocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science." *Colorado Interstate Co.* v. *FPC*, 324 U. S. 581, 589 (1945). Generally,

---

[19] Petitioner National Association of Greeting Card Publishers and intervenor Direct Mail/Marketing Association question the legality of assigning—or attributing—Service Related Costs. We do not rule on this issue. The Rate Commission developed the concept of Service Related Costs only to conform to the District of Columbia Circuit's erroneous view that "assignment" is an intermediate tier requiring attenuated inferences of causation. "When an administrative agency has made an error of law, the duty of the Court is to 'correct the error . . . , and after doing so to remand the case to the [agency] so as to afford it the opportunity of examining the evidence and finding the facts as required by law.'" *NLRB* v. *Pipefitters*, 429 U. S. 507, 522, n. 9 (1977), quoting *ICC* v. *Clyde S.S. Co.*, 181 U. S. 29, 32–33 (1901). The Rate Commission also should assess the impact on the Service Related Costs concept of Congress' recent prohibition of any deviation from the present 6-day delivery schedule. See Omnibus Budget Reconciliation Act of 1981, § 1722, 95 Stat. 759.

the legislature leaves to the ratesetting agency the choice of methods by which to perform this allocation, see, *e. g.*, *American Commercial Lines, Inc.* v. *Louisville & N. R. Co.*, 392 U. S. 571, 590–593 (1968); *Colorado Interstate Co.*, 324 U. S., at 589, although if the statute provides a formula, the agency is bound to follow it. *Ibid.*

We agree with the Rate Commission's consistent position that Congress did not dictate a specific method for identifying causal relationships between costs and classes of mail, but that the Act "envisions consideration of all appropriate costing approaches." PRC Op. R71–1, p. 46; see PRC Op. R74–1, pp. 92, 127; PRC Op. R80–1, pp. 129–133. The Rate Commission has held that, regardless of method, the Act requires the establishment of a sufficient causal nexus before costs may be attributed. The Rate Commission has variously described that requirement as demanding a "reliable principle of causality," PRC Op. R74–1, p. 94, or "reasonable confidence" that costs are the consequence of providing a particular service, PRC Op. 77–1, p. 84, or a "reasoned analysis of cost causation." PRC Op. R80–1, p. 131. Accordingly, despite the District of Columbia Circuit's interpretation, the Rate Commission has refused to use general "accounting principles" based on distribution keys without an established causal basis. But the Rate Commission has gone beyond short-term costs in each rate proceeding since the first.[20]

### B

Section 3622(b)(3) requires that all "attributable costs" be borne by the responsible class. In determining what costs are "attributable," the Rate Commission is directed to look

---

[20] In the first ratemaking proceeding, the Rate Commission used short-run variable costs "because that approach [was] the only viable costing presentation before us." PRC Op. R71–1, p. 56. It stated that "long-run incremental costing (for example) 'remains theoretical and is unproven' on this record." *Id.*, at 56–57. Once long-run costing became feasible, the Rate Commission adopted it.

to all costs of the Postal Service, both "direct" and "indirect."[21]  In selecting the phrase "attributable costs," Congress avoided the use of any term of art in law or accounting. In the normal sense of the word, an "attributable" cost is a cost that may be considered to result from providing a particular class of service.  On its face, there is no reason to suppose that § 3622(b)(3) denies to the expert ratesetting agency, exercising its reasonable judgment, the authority to decide which methods sufficiently identify the requisite causal connection between particular services and particular costs.

The legislative history supports the Rate Commission's view that when causal analysis is limited by insufficient data, the statute envisions that the Rate Commission will "press for . . . better data," rather than "construct an 'attribution'" based on unsupported inferences of causation.  PRC Op. R74–1, pp. 110–111.  Before passage of the Act, Congress had set rates based on the Post Office's ungainly "Cost Ascertainment System," which allocated—on the basis of "distribution keys" like those advocated by the District of Columbia Circuit—all postal expenses to one or another class of mail.[22]  The Kappel Commission determined that this approach was "arbitrary [and] uninformative."  Kappel Commission Report, at 30; see id., at 131.  Many costs are institutional, and the inferences of causation supporting the Post

---

[21] The study of postal ratesetting on which the Kappel Commission based its recommendations defined direct costs as "[t]hose elements of cost which can be unequivocally related to a particular product or output," and indirect costs as "[t]hose elements of cost which cannot unequivocally be associated with a particular output or product."  Foster Associates, Inc., Rates and Rate-making: A Report to the President's Commission on Postal Organization, App. A, pp. iii, iv, reprinted in Kappel Commission Report Annex (1968) (Foster Associates Study).

[22] See generally id., at 1–8 to 1–11, 2–8 to 2–12, 4–8 to 4–24; id., at App. B; Report on Post Office Department Relating to Survey of Postal Rates Structure, Letter from Postmaster General Transmitting a Report on his Survey of Postal Rates, H. R. Doc. No. 91–97 (1969).

Office's allocation of costs to the different classes were simply unsupported by the data. *Id.*, at 29–31, 132–135. In proposing the two-tier approach, therefore, the Kappel Commission stated that each class of service would recover all costs "demonstrably related" to it in order to avoid the inequity of users of one class subsidizing users of another class; however, the "[r]emaining institutional costs would not be apportioned to the several classes of mail by rigid accounting formulas." *Id.*, at 61–62.

The House bill tracked these recommendations, see generally House Report, at 6, and adopted a rate floor consisting of "demonstrably related" costs, H. R. 17070, 91st Cong., 2d Sess., § 1201(c) (1970), which it described as "identifiable costs." House Report, at 10.[23] The Senate bill did not explicitly include a causally based rate floor. See 116 Cong. Rec. 22053 (1970) (remarks of Sen. Fannin). But the Senate plainly rejected the notion of binding ratesetters to "accounting principles" akin to those used in the Cost Ascertainment System. The Senate Report stated that "no particular cost accounting system is recommended and no particular classification of mail is required to recover a designated portion of its cost beyond its incremental cost." Senate Report, at 17.

The conference bill enacted into law incorporated the rate floor contained in the House version, but replaced the phrase "demonstrably related" costs with "attributable" costs. Debate on the ratemaking aspects of the conference bill was

---

[23] The House was aware of the deficiencies of the Cost Ascertainment System since it had held hearings on the subject. See Hearings on Post Office Cost Ascertainment System before the Subcommittee on Postal Rates of the House Committee on Post Office and Civil Service, 91st Cong., 1st Sess., 72 (1969) (testimony of James W. Hargrove, Assistant Postmaster General). The following year, the Subcommittee, through its Chairman, expressed its approval of the Post Office's recent decision "to abolish the cost ascertainment system and supply postal figures based on demonstrably related costs." Hearings on Postal Rates and Revenue and Cost Analysis before the Subcommittee on Postal Rates of the House Committee on Post Office and Civil Service, 91st Cong., 2d Sess., 1 (1970) (remarks of Rep. Olsen).

sparse. On the floor of the House, one conferee defined "attributable" costs as "capable of objective determination and proof either by empirical observation or deductive analysis." 116 Cong. Rec. 27606 (1970) (remarks of Rep. Udall). On the Senate floor, the Act's sponsor explained that attributable costs were "actual postal costs." *Id.*, at 26954 (remarks of Sen. McGee). Neither explanation suggests that the conference bill resurrected accounting principles like those used in the discredited Cost Ascertainment System. The Rate Commission, therefore, acted consistently with the statutory mandate and Congress' policy objectives in refusing to use distribution keys or other accounting principles lacking an established causal basis.[24]

## C

The Postal Service contends that Congress intended long-term and short-term variable costs to be attributed, but that

---

[24] Petitioner United Parcel Service argues that extended use of cost-of-service principles is necessary to avoid subsidization of those classes of mail for which the Postal Service has competition, such as parcel post, by other classes of mail for which the Postal Service enjoys a statutory monopoly, such as first class. Brief for Petitioner United Parcel Service of America, Inc., 39–42. Congress' concern about such cross-subsidies, of course, was one motive for including the rate floor established in § 3622(b)(3). But Congress adopted the Kappel Commission's conclusion that, unless a reliable connection is established between a class of service and a cost, allocation of costs on cost-of-service principles is entirely arbitrary. Beyond requiring the attribution of all costs for which a reliable connection can be established, Congress intended to prevent undue imposition on users of monopolized classes, and to prevent unfair competition, in two ways. First, by making the Rate Commission independent of operating management, Congress meant to minimize the temptation to solve fiscal problems by concentrating rate increases on first-class mail, which is by far the major source of postal revenue. Senate Report, at 13. Second, § 3622(b) requires the Rate Commission to consider, in "assigning" costs remaining above the rate floor, "the effect of rate increases upon the general public . . . and enterprises in the private sector of the economy engaged in the delivery of mail matter other than letters," § 3622(b)(4), and "the available alternative means of sending and receiving letters and other mail matter at reasonable costs," § 3622(b)(5).

Congress did not direct attribution of costs, apart from fixed costs incurred by a particular class, that do not vary directly or indirectly with volume. We agree that, because the Rate Commission has decided that these methods reliably indicate causal connections between classes of mail and postal rates, the Act requires that they be employed. But the Act's language and legislative history support the Rate Commission's position that Congress did not intend to bar the use of any reliable method of attributing costs. See PRC Op. R71–1, pp. 42–46.

The record before Congress in 1970 indicated that identifying which classes cause specific costs was a "most difficult" task, Foster Associates Study, at 1–5, and that a long-run variable cost approach was "the best available measure" of cost causation. *Id.*, at 1–6. The Kappel Commission consequently recommended that each class bear, "as a minimum," all "demonstrably related" capital and operating costs—"[i]n economic terms . . . the long-run variable costs ascribable to it." Kappel Commission Report, at 131.[25] Although the House bill adopted the Kappel Commission's requirement that each class bear its "demonstrably related costs," we do not believe that in so doing it intended to limit attribution to the long-run variable approach. The Kappel Commission did not emphasize technical matters, focusing instead on the need for nonarbitrary demonstrations of causation.[26] Postmaster

---

[25] The study underlying the Kappel Commission Report rejected a short-term approach as likely to generate widely fluctuating rates. Foster Associates Study, at 1–5 to 1–6. It recommended measuring variability not just with respect to units of output, but with respect to other variables as well, such as the capacity necessary to produce that output. *Id.*, at 3–33 to 3–34.

[26] The Kappel Commission explained the rate floor in these terms:

"[T]o avoid undue discrimination every class of service should, as a minimum, pay for all of those costs which it alone causes. Thus . . . each . . . class of mail should pay for those *added* costs of processing and delivery which it causes the Post Office to incur. It makes *no* difference whether these costs are capital costs or operating costs, nor should the inquiry be confined to what costs the class has generated historically, but should ex-

General Blount informed the House that the phrase "demonstrably related costs" was employed to avoid the confusion generated by the use of terms of art such as "marginal" or "incremental" costs. "Demonstrably related costs," he explained, "are those costs which can be traced directly to the class of service in question . . . . [W]e believe that the legislative history has made amply clear what the term means, without shackling future generations to any particular economic theory." Hearings on Post Office Reorganization before the House Committee on Post Office and Civil Service, 91st Cong., 1st Sess., 1273 (1969) (Post Office Response to Memoranda Submitted by J. Edward Day).

The House Report did not mention any particular costing technique. In defining the rate floor established by the House bill, it explained only that each class would be required to bear "at least its own identifiable costs." House Report, at 10. Given the House Report's repeated statements that Members of Congress are ill-equipped to deal with the highly technical economic, accounting, and engineering questions lying at the heart of the ratemaking process, it is implausible to suppose that the House intended to prescribe for the experts appointed to resolve this problem a formula for identifying causal relationships. It is also unlikely that the House intended to limit the Postal Service forever to accounting methods current at the time the bill was enacted.[27]

tend to include what costs it will cause in the foreseeable future." Kappel Commission Report, at 131 (emphasis in original); see *id.*, at 61–62.

[27] At one point, the Senate Report states, without elaboration, that "no particular cost accounting system is recommended and no particular classification of mail is required to recover a designated portion of its cost beyond its incremental cost." Senate Report, at 17. Arguably, this statement suggests, as a minimum, the use of some form of variability analysis. As the Foster Associates Study explained, "incremental costs" may mean short-run costs, excluding overhead, or may mean long-run costs, including capacity costs and other overhead. Foster Associates Study, App. A, at iv, and n. 1. Whatever the Senate Report meant by "incremental costs," the quoted passage itself leaves open the possibility that the Rate Commission may find that other "accounting methods" are appropriate. Like the

The Conference Committee abandoned the phrase "demonstrably related costs" in favor of "attributable" costs, a phrase that connotes the use of judgment and has no technical meaning or significant antecedent legislative history. It also retained the House bill's explicit requirement of a rate floor. In so doing, the conferees ensured that identification of causal relationships would not be limited to those methods discussed in the Kappel Commission Report, but would encompass all postal costs, whether "direct or indirect," that the experts, on whatever reasoned basis, found to be attributable to a particular class of mail.

## D

The Second Circuit found controlling the definition of "attributable" costs contained in the Statement of the Managers on the Part of the House, appended to the Conference Report on the Act, H. R. Conf. Rep. No. 91–1363, pp. 79–90 (1970). *Newsweek, Inc.* v. *USPS,* 663 F. 2d, at 1199–1200.[28] The House Managers stated that the conference substitute established a rate floor for each class of mail "equal to costs . . . *that vary over the short term* in response to changes in

House, the Senate believed that Congress should be taken out of the ratemaking process and the task put in the hands of an "expert commission," which would allocate costs "on a scientific or quasi-scientific basis." Senate Report, at 11. The bill initially passed by the Senate spoke of assigning any type of postal cost, including overhead costs, wherever proper. S. 3842, 91st Cong., 2d Sess., § 3704(g)(3) (1970).

[28] The Second Circuit apparently believed that the Managers' Statement was the Report of the entire Conference Committee. 663 F. 2d, at 1200. Were this the case, its definition would be due great weight. The Conference Report, however, contained only the text of the Act. There is no dispute that the House Managers' Statement became available only after the Senate had completed its consideration of the Conference Report. See PRC Op. R80–1, App. B, p. 11. Thus, while certainly significant, this statement does not have the status of a conference report, or even a report of a single House available to both Houses. See *Vaughn* v. *Rosen,* 173 U. S. App. D. C. 187, 193, 523 F. 2d 1136, 1142 (1975); K. Davis, Administrative Law Treatise § 3A.31, p. 175 (1970 Supp.).

volume of a particular class or, even though fixed rather than variable, are the consequence of providing the specific service involved." H. R. Conf. Rep. No. 91–1363, at 87 (emphasis supplied). The Rate Commission specifically addressed and rejected this argument when it was advanced by the Postal Service in the first two ratemaking proceedings, see PRC Op. R74–1, pp. 101–102, 126–127; PRC Op. R71–1, pp. 42–46, and even the Postal Service since has abandoned it. The statute's plain language and prior legislative history, discussed above, indicate that Congress' broad policy was to mandate a rate floor consisting of all costs that could be identified, in the view of the expert Rate Commission, as causally linked to a class of postal service. We cannot say that the House Managers' Statement alone demonstrates that the Rate Commission's view is "inconsistent with the statutory mandate or . . . frustrate[s] the policy that Congress sought to implement." *FEC* v. *Democratic Senatorial Campaign Committee*, 454 U. S., at 32.

## VI

We hold that the Rate Commission has reasonably construed the Act as establishing a two-tier ratesetting structure. First, all costs that in the judgment of the Rate Commission are the consequence of providing a particular class of service must be borne by that class. The statute requires attribution of any cost for which the source can be identified, but leaves it to the Commissioners, in the first instance, to decide which methods provide reasonable assurance that costs are the result of providing one class of service.

For this function to be performed, the Postal Service must seek to improve the data on which causal relationships may be identified[29] as the Rate Commission remains open to the

---

[29] The Rate Commission constantly has stressed the importance to its ratesetting function of receiving more comprehensive and more detailed data from the Postal Service. See PRC Op. R80–1, pp. 107, 111–112, 209–211; PRC Op. R77–1, pp. 85–87; PRC Op. R76–1, pp. 83–87, and App.

use of any method that reliably identifies causal relation-ships. In our view, the Rate Commission conscientiously has attempted to find causal connections between classes of service and all postal costs—both operating costs and "overhead" or "capacity" costs—where the data are suffi-cient. PRC Op. R74–1, pp. 126–127; see PRC Op. R80–1, pp. 129–131. The Rate Commission is to assign remaining costs reasonably on the basis of the other eight factors set forth by § 3622(b).

Inasmuch as the rates at issue were established according to the District of Columbia Circuit's erroneous view of the Act, we agree with the Second Circuit that this matter must be remanded to the agencies. While we do not agree with all that the Second Circuit said in its opinion, we affirm its judg-ment in remanding the cases. The remand will be for fur-ther proceedings consistent with this opinion.

*It is so ordered.*

---

E; PRC Op. R74–1, pp. 110–111, 123–127; PRC Op. R71–1, pp. 48–57. The importance of a detailed data base was emphasized in the Foster Asso-ciates Study, at 5–21, and in the Kappel Commission Report, at 62. The Senate Report recognized that achievement of the Act's ambitious goals would depend on cooperation between the two agencies. Senate Report, at 13. The Postal Service, which "alone takes in the full scope of Postal Serv-ice operations . . . [and] alone is in a position to influence the Postal Serv-ice's day-to-day accounting procedures and record keeping," *Association of American Publishers, Inc.* v. *Governors of United States Postal Service,* 157 U. S. App. D. C. 397, 408, 485 F. 2d 768, 779 (1973) (concurring opin-ion), must constantly seek to aid the Commission in fulfilling § 3622(b)'s re-quirement that all costs capable of being considered the result of providing a particular class of service are identified, and borne by that class.