## DOW JONES & COMPANY, INC., Petitioner.

v.

## UNITED STATES POSTAL SERVICE, Respondent.

**Advertising Mail Marketing Association, et al., Intervenors.**

No. 96–1083.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 7, 1997.

Decided April 11, 1997.

Rehearing Denied June 5, 1997.

Michael F. McBride, Washington, DC, argued the cause for petitioner. Linda K. Breggin, Washington, DC, was with him on the briefs. Rita M. Theisen, Washington, DC, entered an appearance.

Daniel J. Foucheaux, Jr., Chief Counsel, U.S. Postal Service, Alexandria, VA, argued the cause for respondent. Eric P. Koetting, Attorney, Washington, DC, was with him on the brief. Susan M. Duchek, Washington, DC, entered an appearance.

Michael F. McBride and Linda K. Breggin, Washington, DC, were on the brief for intervenor Gannett Co., Inc. Rita M. Theisen, Washington, DC, entered an appearance.

David R. Straus, Stephen M. Feldman, Carolyn P. Carmody, Timothy W. Bergin and Robert A. Saltzstein, Washington, DC, were on the brief for intervenors American Business Press, et al.

James R. Cregan, John M. Burzio and Timothy L. Keegan, Washington, DC, were on the joint brief for intervenors Magazine Publishers of America and Time Warner, Inc.

Before: SILBERMAN, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

We here review the decision of the Governors of the United States Postal Service ("Governors" or "Postal Service" or "Service") to adopt new postal rates and mail classifications recommended by the Postal Rate Commission ("Commission" or "PRC") in Docket MC95-1. Petitioner Dow Jones & Co., publisher of the Wall Street Journal, and intervenor Gannett Co., publisher of USA Today, attack the new second-class mail rates on both procedural and substantive grounds.

* * *

The Governors are ultimately responsible for establishing postal rates, fees and classifications. 39 U.S.C. § 3621 (1994). They can modify existing rates or classifications, however, only on the basis of a recommended decision by the Commission, which they can elicit by filing a request. Id. §§ 3622, 3623. After the Commission issues its recommendation, the Governors may approve the decision, allow it to take effect under protest (i.e., meanwhile either seeking judicial review or returning the issue to the Commission), reject it, or modify it (but they may choose the latter only where they find that revenues under the Commission's rates would not match costs). Id. § 3625.

In March 1995 the Postal Service filed with the Commission a request for changes to its classes and rates, the relevant ones here being changes to the Regular Rate subclass of second-class mail (since renamed the Periodicals class). The Service proposed splitting Regular Rate mailers into two new subclasses, "Publications Service" and "Regular." Despite the slight name change, the proposed Regular subclass had eligibility and content restrictions similar to those of the existing Regular Rate subclass.

The proposed Publications subclass shared its minimum requirements with the proposed Regular subclass. But a Publications mailer would also have had to meet terms relating to barcoding, postal payment and containerization, as well as more stringent terms relating to advertising content, presorting, subscriber lists, etc. The Regular subclass would retain the distinction between the zoned advertising pound charge, which varied on the basis of distance mailed, and the unzoned editorial pound charge, which did not. By contrast—and a great plus for mailers like Dow Jones and Gannett, with capability for local production or "drop-shipping" of their national publications—the Publications subclass would be subject to a pound rate zoned for the weight of *both* editorial and advertising content.

The Commission did not recommend these proposed subclasses. Rather, it proposed the retention of the existing Regular Rate subclass and its unzoned editorial pound rate, but with increased rate discounts to reflect more recent information on the cost savings that automation-ready mail afforded the Postal Service. The increase in discounts forced an increase in the base rate, and thus a net rate increase for mailers ineligible for the discounts. Among these mailers were Dow Jones and Gannett; the barcoding discounts are available only for "machinable" publications, and the Postal Service lacks machines for barcoding newspapers. See Letter from Michael F. McBride to Tirso del Junco, Feb. 15, 1996, at 5.

Although the Postal Service was clearly disappointed at the Commission's failure to adopt the new subclasses or to endorse a zoned editorial pound charge for the Publications subclass, it adopted the Commission's recommendation.

*Procedural Issues*

Dow Jones's procedural complaint is at bottom one of surprise. While the Postal Service's request embraced rate changes to second-class mail only in the context of its proposed classification changes, petitioner says, the Commission recommended rate changes to the existing subclass without the proposed classification changes. Petitioner

argues that this (1) exceeded the Commission's statutory authority and (2) deprived petitioner of due process.

*Scope of the Postal Service's Request—Statutory Authority*

■ The Postal Service responds to the statutory authority claim with a procedural defense of its own—that Dow Jones failed to raise the question before the Commission and has therefore waived it. Dow Jones says that its first opportunity to raise the issue was before the Governors, and that doing so at that stage was adequate to preserve the issue.

The succession of governmental entities here makes the exhaustion issue unusual. If we saw the Postal Service simply as a regulated carrier, then it would be odd—indeed absurd—to suggest that it is enough for a shipper to raise its claims to the carrier after the regulatory agency has acted. The Postal Service, however, is not a private carrier, but another instrumentality of the United States, and its range of responses to a Commission recommendation is broader than that of an ordinary regulated carrier. If it had agreed with Dow Jones that the recommendation diverged from the scope of its own request, for example, it could have rejected the recommendation and filed a new request. See 39 U.S.C. § 3625(d). Moreover, the Commission appears to disclaim any power to entertain petitions for rehearing, having in the past rejected one on the ground that "[t]he law does not provide and there is no established precedent for participants to obtain reconsideration." Order Denying Requests for Reconsideration, *Postal Rate and Fee Changes,* Commission Docket No. R94–1, at 1 (Dec. 9, 1994), quoted in Dow Jones Reply Br. at 16. Thus, once the Commission made its decision to recommend rate changes without reclassification, Dow Jones's chance for a Commission change of heart was nil.

Under the statute, significantly, it is the *Postal Service*'s decision that we review. 39 U.S.C. § 3628. The alleged default by failure to exhaust is therefore plainly not jurisdictional. Because on the merits we find the Commission's recommendation within the scope of the Postal Service request, we leave the exhaustion issue to another day.

■ For rate changes, the Postal Service's request shapes the Commission's power to recommend. For such changes the Commission is to issue a recommended decision "on the [Postal Service's] request for changes in rates or fees in each class of mail or type of service," 39 U.S.C. § 3622(b), whereas the Commission may recommend classification changes on its own initiative, *id.* § 3623(b). We have explained Congress's decision to deny the Commission authority to initiate ratemaking on the ground that it "does not possess the Postal Service's command of the cost, revenue, and volume information which is crucial to rate matters, nor is the PRC responsible for operating within a requested budget." *Dow Jones & Co. v. United States Postal Service,* 656 F.2d 786, 790 (D.C.Cir. 1981). Thus the Commission's ratemaking authority is "governed by the scope of the Postal Service's original request." *Mail Order Ass'n of America v. United States Postal Service,* 2 F.3d 408, 422 (D.C.Cir.1993); *Dow Jones & Co.,* supra (Commission exceeds authority where Postal Service makes no rate request).

■ In practice the boundary may be hard to police. Most Postal Service requests are quite complex, involving changes in both rates and classifications. See *National Easter Seal Society v. United States Postal Service,* 656 F.2d 754, 762–63 (D.C.Cir.1981). Because the Postal Service not only frames the initial request but ultimately must decide how to dispose of the Commission's recommendation, and because the request's role as a limit on the Commission is largely to protect Postal Service interests, we think it appropriate to defer to any reasonable view of the boundaries of the request that is shared by both the Commission and the Postal Service. Cf. *National Ass'n of Greeting Card Publishers v. United States Postal Service,* 462 U.S. 810, 820–21, 103 S.Ct. 2717, 2725, 77 L.Ed.2d 195 (1983) (courts owe "due deference" to Commission's interpretation of § 3622(b)'s enumeration of factors to guide ratemaking).

■ Here the Postal Service's proposal is ambiguous as to its scope. The Service captioned its request as one for "classification

reform." Request of the United States Postal Service for a Recommended Decision on Classification Reform of First–, Second–, and Third–Class Mail, Docket No. MC95–1, at 1 ("Request"). But at the same time it specifically sought new rates for the new classifications and relied upon both 39 U.S.C. § 3622(b) (ratemaking authority) and § 3623(c) (classification authority). See *id.* at 9. In addition, a rate discount strategy was compatible with the Service's purposes. It sought the classification changes "to provide adequate and efficient postal services at fair and reasonable rates that meet the needs of its customers," *id.* at 1–2, and sought to encourage "as much high-quality, automation compatible and pre-barcoded mail as is practicable . . . ," *id.* at 3. The Service was also concerned that in the current "competitive environment," efficient mailers might stop using the Postal Service for delivery and turn to private providers if rates did not better reflect actual costs. *Id.* Clearly these are goals that can be met—in many contexts are met—by carefully conditioned discounts. Moreover, unless the discounts paid for themselves (as they could if demand for the discounted services were elastic enough and the resulting surge in use could adequately reduce the Service's average costs), which petitioner does not argue, any deepening of discounts implied rate increases for ineligible mailers.

■ This analysis suggests that the Commission's decision was within the scope of the Postal Service's request. But some other phrases in the Request give us pause:

> Th[e] contribution neutrality goal was established because this Request is not intended to be a revenue case, nor an opportunity to challenge, change, or improve on the Commission's conclusions drawn from the record in Docket No. R94–1. *The rate changes included in this Request are solely for the purpose of applying the pricing factors . . . to the reformed subclasses*; the Postal Service is not seeking to increase or decrease institutional cost contributions beyond the levels recommended by the

Commission and approved by the Governors in Docket No. R94–1.

*Id.* at 5 (emphasis added).

The passage certainly could be read to say that the Service was not seeking rate changes independent of the classification changes. On the other hand, the highlighted language appears in a discussion of institutional cost contributions,[1] not a discussion relating to whether rate discounts might be substitutes for reformed subclasses. Moreover, the primary focus seems to be to disclaim intent to secure an overall rate increase.

Once the Commission issued its recommendation, the Governors clearly found it within the terms of the Request. They characterized the parties' response to the recommendation as "similar to our own . . .—disappointment that the Commission did not recommend more of the Postal Service's proposals, but recognition that the changes that were recommended represent some improvement." Decision of the Governors of the United States Postal Service on the Recommended Decision of the Postal Rate Commission on Classification Reform I, Docket No. MC95–1 (Mar. 4, 1996) at 17. Similarly, the Governors acknowledged that the recommendation "will not achieve anywhere near the full range of objectives which the Postal Service and mailers like Dow Jones hoped to attain from classification reform." *Id.* at 18. Thus the Service saw the recommendation as half of the requested loaf (or perhaps a quarter), not a whole new dish.

Moreover, given the substantial similarity between what can be achieved through discount manipulation and through new classification, the Service's view is reasonable. A subclass (or set of subclasses) with characteristics that excluded Dow Jones and benefitted other mailers would have inflicted substantially the same injury on Dow Jones as did the rate discount system adopted. What appears to have hurt Dow Jones were the narrow definition of eligibility for the barcoding discounts and the rejection of the fully zoned pound charge. Dow Jones has not

---

1. Institutional costs are costs not directly attributable to a particular class of mail but are apportioned among the classes. See *Mail Order Ass'n,*

2 F.3d at 425 (discussing § 3622(b)(3) of the Postal Reorganization Act).

shown that anything in these key decisions was ineluctably dependent on the Commission's decision to recommend rate changes rather than classification changes.

*Statutory Hearing and Due Process Requirements*

■ Dow Jones and Gannett make a closely related claim based on the statutory requirement of a hearing complying with 5 U.S.C. §§ 556 & 557 and on the due process clause of the Fifth Amendment. See *Mail Order Ass'n*, 2 F.3d at 429 (noting that 39 U.S.C. § 3624(a) expressly makes those sections of the Administrative Procedure Act ("APA") applicable). The Postal Service points out that the APA's notice provisions do not apply to the Postal Service. See *National Easter Seal Society*, 656 F.2d at 766–68; see also 39 U.S.C. § 410(a). Section 3624(a)'s explicit application of the hearing requirements of §§ 556 & 557 to the *Commission*, however, necessarily implies that it—the Commission—must supply whatever notice is necessary to make the hearing right meaningful. Dow Jones makes no argument as to any particular characteristic of the required notice that is drawn from the due process clause, so we need not wrestle with such issues as whether mailers have any entitlement protected by the clause. Cf. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

■ Though the claims are similar to the previous one, here the Postal Service Request is no longer the sole touchstone for notice. Rather, the Commission's Federal Register Notice, "Mail Classification Schedule, 1995 Classification Reform I; Notice and Order on Filing of Major Revisions to the Domestic Mail Classification Schedule (With Related Postal Rate Changes)," 60 Fed.Reg. 16388 (1995) (the "Notice"), comes into play. It, however, naturally referred to the Postal Service's Request, noting that it was on file with the Commission. So it follows that what we have already said about the implications of the Request is also applicable here.

As had the Request, the Notice explained the Postal Service's interests, including "the encouragement of low-cost mailstreams; [and] the modernization and standardization of mail entry requirements...." *Id.* at

16388/2. This language conjures up the same broad range of possible solutions that we noted earlier. As had the Request, the Notice included an arguably deceptive phrase, the comment that "rate changes ... are solely for the purpose of applying the pricing factors of the Postal Reorganization Act to the reformed subclasses." *Id.* at 16388/3. Again, however, the context was a discussion of changes to institutional cost contributions, and an insistence that the effect sought was "contribution neutrality," *id.* at 16388/2, i.e., not a general rate increase.

Nor can Dow Jones fairly claim that the tenor of the proceeding threw it off track, nullifying the effects of this notice. The Commission issued a notice of inquiry that invited comments on discounts "in the existing or proposed rate structures." Notice of Inquiry No. 1 Concerning Second–Class Mail Reclassification, Docket No. MC95–1, at 2 (Aug. 28, 1995). Dow Jones in fact responded, saying that such discounts would be an acceptable solution but much inferior to reclassification. While Dow Jones now explains these comments away as being based on the implicit premise of a *new* request and proceeding, neither the notice of inquiry nor Dow Jones' comments express such a limit. While Dow Jones notes a specific suggestion by another party that rate discounts should be explored in a future case, to be started on the "conclusion" of the pending one, see Brief of American Business Press, at 79–80 (Nov. 6, 1995), the suggestion falls far short of indicating any general understanding (or even that brief-writer's understanding) that the pending proceeding *could not* embrace such a strategy. Nor has Dow Jones pointed us to some contextual feature from which we (or the Commission) might infer the limit now asserted.

While Dow Jones notes that the cost information used by the Commission to calculate rates was submitted late in the proceeding, it does not suggest that the Commission would have prevented it from cross-examining the Postal Service witnesses. Cf. *Mail Order Ass'n*, 2 F.3d at 429 (reversing because of the Commission's reliance on "novel access cost methodology ... never subjected to scrutiny during the hearing"). Rather, its claim is

that the Service's and the Commission's misleading focus on reclassification diverted its attention, so that it failed to attack data that in the pure rate change context proved far more injurious than Dow Jones thought they would in that of reclassification. But because this depends on what we have already found to be a strained idea of a vast gulf between the two, and because Dow Jones has failed to pinpoint any exact way in which a clearer warning would have altered its approach, we must reject the claim.

### The Unzoned Editorial Pound Charge

■ Dow Jones's primary substantive argument is that the Commission wrongly rejected the unzoned pound charge for editorial matter. The Postal Service and the Commission have long disagreed about the desirability of extending zoned rates from the advertising pound charge to the editorial pound charge, a change the Postal Service has sought in order to better reflect mailing costs and to reduce the risk of losing the business of price-elastic mailers with local production or drop-shipping capability. In an earlier proceeding, the Postal Service had proposed a zoned editorial pound charge for the regular rate subclass. The Commission rejected it, and on appeal we upheld the decision in reliance on 39 U.S.C. § 101(a), which encourages the Service to "bind the nation together through the personal, educational, literary and business correspondence of the people." See *Mail Order Ass'n*, 2 F.3d at 436. We found that this provision allowed the Commission to pursue a goal of encouraging an increase in "the *nationwide* distribution" of information. *Id.* (emphasis in original).

In this proceeding the Postal Service attempted to get part of what it didn't get in the *Mail Order Ass'n* proceeding. It proposed an unzoned editorial pound rate for the Regular subclass but a fully zoned pound rate for the Publications subclass. Dow Jones argues that it was arbitrary and capricious for the Commission to cling to the unzoned pound rate without evidence to justify its continuance and to use its preference for the unzoned pound rate as the basis for rejecting the Postal Service's reclassification proposal. Neither step of that claim is convincing.

■ Dow Jones interprets *Mail Order Ass'n* as saying the Commission could adopt an unzoned editorial pound charge only if it found that a zoned one would threaten the existence of particular periodicals. This dramatically overreads *Mail Order Ass'n*. Although in *Mail Order Ass'n* we noted testimony that certain publications might be driven out of business by a zoned editorial pound charge, we by no means held that evidence of such a stark state of affairs was required. We approved the Commission's decision to retain a "rate structure favoring mailers who send their publications long distances," *id.* at 437, and the same principle supports the Commission here.

Further, it simply isn't true that the Commission relied solely on the zoned rate as the reason for rejecting the proposed classification scheme. It did find the unzoned pound charge "a medium for binding the nation together...." PRC Opinion at V–53. But it also invoked other considerations. See generally *Mail Order Ass'n*, 2 F.3d at 434 (Commission has wide discretion in applying statutory factors). It found that creation of an additional subclass would "introduce more, rather than less, complexity." PRC Opinion at V–58; see § 3622(b)(7) (Commission shall consider "simplicity of structure for the entire schedule...."). It said that the Postal Service had divided the subclass "along an unfair, arbitrary line." PRC Opinion at V–59; see § 3622(b)(1) (Commission shall consider "establishment and maintenance of a fair and equitable schedule."). It rejected the Service's emphasis on "changing mailers' behavior" and expressed concern that many second-class publishers could not qualify for the Publications Service without "considerable adjustments in almost every aspect of their operations." PRC Opinion at V–59; see § 3622(b)(4) (the Commission shall consider "the effect of rate increases upon ... business mail users"). And finally, it rejected what it called the Postal Service's "heavy emphasis ... on 'driving costs from the system.'" PRC Opinion at V–59. Because Dow Jones does not acknowledge these other considerations, it fails to attack them, and we

express no opinion as to their soundness. By the same token, we must reject its image of a Commission zeroing in solely on the zoned editorial pound charge.

Dow Jones's final argument is that the Commission was arbitrary and capricious for failing to apply the principle of efficiency-based pricing to *all* characteristics of second-class publications that bear on efficiency. This is, of course, largely a replay of Dow Jones's drive toward a zoned pound charge. But incremental steps toward efficiency are clearly permissible where the Commission relies on statutorily permissible factors for stopping where it has.

* * *

The petition for review is

*Dismissed.*