

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

IN THE MATTER OF THE )
APPLICATION OF SPIRE )
MISSOURI, INC., TO CHANGE )
ITS INFRASTRUCTURE SYSTEM )
REPLACEMENT SURCHARGE )
IN ITS SPIRE MISSOURI EAST )
SERVICE TERRITORY; IN THE )
MATTER OF THE APPLICATION )
OF SPIRE MISSOURI, INC., TO )
CHANGE ITS ) **WD83159**
INFRASTRUCTURE SYSTEM ) **Consolidated with WD83162**
REPLACEMENT SURCHARGE )
IN ITS SPIRE MISSOURI WEST ) **FILED: September 1, 2020**
SERVICE TERRITORY, )
   Appellant-Respondent, )
v. )
 )
MISSOURI PUBLIC SERVICE )
COMMISSION, )
   Respondent, )
 )
MISSOURI OFFICE OF PUBLIC )
COUNSEL, )
   Respondent-Appellant. )

**Appeal from the Public Service Commission**

**Before Division Four: Cynthia L. Martin, C.J., and
Alok Ahuja and Thomas N. Chapman, JJ.**

Spire Missouri, Inc. appeals from a Report and Order issued by the Public

Service Commission. The Report and Order addressed Spire's applications to adjust

the Infrastructure System Replacement Surcharge for its East and West service

territories, to reflect costs Spire incurred between October 2017 and January 2019.

The Commission granted Spire's applications in large measure. It found, however, that it had no jurisdiction to address part of Spire's applications because the applications concerned costs which were the subject of a pending appeal in this Court. The Commission also found that certain of Spire's claimed costs were not eligible to be included in an Infrastructure Surcharge, because they related to Spire's replacement of plastic piping which was not worn out or deteriorated.

Spire appeals. The Office of Public Counsel cross-appeals, arguing that the Commission's Report and Order allows Spire to include certain ineligible costs in its Infrastructure Surcharge. We affirm.

**Factual Background**

On January 14, 2019, Spire filed applications with the Commission in which it requested an increase in the Infrastructure Surcharge it was permitted to charge customers, to reflect the cost of pipeline replacement projects it had conducted in its East and West service territories.[1] Spire's applications sought to adjust its Infrastructure Surcharge to recover costs incurred during two separate time periods: October 1, 2017, through June 30, 2018; and July 1, 2018, through January 31, 2019.

By statute, "[g]as corporations are permitted to recover certain infrastructure system replacement costs outside of a formal rate case through a surcharge on their customers' bills." *In re Verified Application & Petition of Liberty Energy (Midstates) Corp.*, 464 S.W.3d 520, 522 (Mo. 2015). As explained in § I of the Discussion which follows, this Court has held that Spire is entitled to include in its Infrastructure Surcharge only the cost of replacing worn or deteriorated cast iron or bare steel pipes to comply with state or federal safety requirements. We held that Spire is *not*

---

[1]    Spire was formerly known as Laclede Gas Company. It acquired Missouri Gas Energy in 2013. Spire's East service territory comprises the area formerly served by Laclede Gas Company, while its West service territory was formerly operated by Missouri Gas Energy.

entitled to include in its Infrastructure Surcharge the cost for replacing newer plastic piping which is not itself worn or deteriorated, and which is not subject to a governmental safety mandate.

Until approximately ten years ago, Spire replaced older cast iron or steel pipes in a piecemeal fashion. Beginning in approximately 2010 or 2011, Spire implemented a strategic program to redesign and replace its gas distribution facilities on a system-wide basis. Under its new strategic replacement program, Spire abandons existing distribution facilities on a neighborhood-wide basis, and bypasses and replaces the existing piping with smaller-diameter plastic pipes operating at a higher pressure than the old system. *In re Application of Laclede Gas Co. to Change its Infrastructure Sys. Replacement Surcharge v. Office of Pub. Counsel*, 539 S.W.3d 835, 837 (Mo. App. W.D. 2017) ("*Spire I*") (noting the gas utility's new strategy "focused on replacing entire neighborhood systems at one time"). The Commission found that, under its strategic replacement program, Spire was replacing between 60 and 65 miles of cast-iron piping in its Missouri East service territory per year, and approximately 120 miles of such piping in its Missouri West territory.

Most of the costs Spire sought to recover in its January 2019 applications arose from its strategic replacement program. By retiring existing piping in place and replacing it on a neighborhood-wide basis, this systematic program replaces worn out or deteriorated cast-iron or steel pipes, and newer plastic piping, in a single project. Because we have held that only the cost of replacing the metal piping is eligible for inclusion in Spire's Infrastructure Surcharge, its strategic replacement program gives rise to cost-allocation issues.

To comply with our prior decisions holding that the cost of replacing plastic pipe must be excluded from the Infrastructure Surcharge, Spire supported its January 2019 applications with cost studies for each individual project conducted

3

pursuant to its strategic replacement program – 509 separate cost studies in all. These project-specific cost studies compared the costs of retiring and replacing the plastic pipe as part of a neighborhood-wide project, with the cost of reusing the existing plastic pipe (while replacing only the worn out or deteriorated metal pipe). Where one of its cost studies showed that the cost of replacing plastic piping was *less than* the cost of replacing only the metal pipe, Spire sought to recover the entire cost of the specific project through its Infrastructure Surcharge. Spire justified the recovery of the entire project cost by arguing that replacing the plastic piping added no incremental cost to the particular project, and actually resulted in a cost *savings* for ratepayers compared to replacing the metal pipe alone. On the other hand, when its cost analysis showed that it was *more expensive* to replace the plastic pipe than to reuse the existing pipe on a particular project, Spire excluded the increased cost from its Infrastructure Surcharge request (on the theory that the increased incremental cost was attributable solely to the replacement of plastic components which were not eligible for inclusion in the surcharge).

The PSC's Staff agreed with Spire's cost-allocation approach. It argued, however, that the Commission lacked jurisdiction to adjust Spire's Infrastructure Surcharge for costs incurred between October 1, 2017, and June 30, 2018, because the Commission had addressed those same costs in an earlier proceeding, and the Commission's Report and Order addressing Spire's prior surcharge-adjustment request was pending on appeal in this Court. *See* Nos. WD82302 and WD82373.

The Office of Public Counsel (or "OPC") objected to Spire's applications, and requested an evidentiary hearing.

The Commission held an evidentiary hearing on April 3 and 4, 2019, in which Spire, PSC Staff, and OPC participated. Following the hearing, the Commission ordered Staff to perform calculations allocating the costs of Spire's strategic replacement projects based on the relative length of the cast-iron or steel pipes

4

replaced in a particular project, as compared to the length of plastic piping replaced in the project. In its final Report and Order, the Commission explained that it requested these percentage-based calculations because "no party had provided a calculation as to what that party believed was the specific cost of the replacement of ineligible plastic mains and service lines to be removed from Spire's" surcharge-adjustment request, "even though all parties to the case had access to the work orders and other information necessary to identify that cost."

Staff filed the requested report on April 25, 2019, and a correction on April 29. Spire filed a response on April 30, 2019. While Spire disagreed that the percentage-of-total-length methodology accurately represented the cost attributable to replacing plastic pipe, it agreed that Staff "has accurately calculated the amounts to be excluded from [its surcharge-adjustment] request in accordance with the Commission's directive."

The Commission entered its final Report and Order addressing Spire's January 2019 applications on August 21, 2019. Consistent with Staff's recommendation, the Commission dismissed the portions of Spire's applications which sought to recover costs incurred from October 2017 through June 2018. The Commission reasoned that it had previously addressed the surcharge-eligibility of "the same costs from the same time period"; because its earlier decision was then pending on appeal, the Commission held that it did not have jurisdiction to hear new evidence and make a different decision concerning those costs.

The Report and Order then turned to the costs incurred between July 2018 and January 2019. The Commission's Report and Order found that "[t]here was little, if any, evidence that the non-cast iron or bare steel components (plastic components) were in a worn out or deteriorated condition. In fact, the evidence generally showed that the plastic pipe was not worn out or in a deteriorated condition." The Report and Order found that "the plastic components, whether part

5

of the mains or service lines, are not being replaced because they are themselves in worn out or deteriorated condition, but because they are part of the systematic replacement of all the pipe."

The Report and Order rejected Spire's cost studies. It found that Spire's analyses failed to properly allocate the costs of neighborhood-wide pipe replacement projects between the replacement of deteriorated metal piping, and the replacement of plastic piping.

> Spire Missouri argues that the costs to replace the plastic components were less than the costs of reusing the plastic components and, therefore, there are no incremental costs of replacing the plastic. However, this argument does not align with the statutory requirements or the Court's interpretation of those requirements and is an inappropriate comparison. [¶] The ISRS [or Infrastructure Surcharge] was not designed to allow early recovery of system-wide replacement of infrastructure, only the replacement of worn out or deteriorated infrastructure. Plastic components that are not otherwise worn out or deteriorated cannot become ISRS eligible as part of a systemic redesign.

Rather than employing Spire's cost studies, the Commission determined the plastic-related costs to be excluded from the Infrastructure Surcharge using the percentage calculations it had ordered Staff to prepare.

Spire's January 2019 applications also sought to include in its Infrastructure Surcharge certain costs it had incurred under "blanket work orders." As explained in the Commission's Report and Order, "[b]lanket work orders are work orders that cover a large number of tasks which remain open for an extended period and contain items that are not planned replacement projects." In order to identify the costs incurred under blanket work orders which were eligible for inclusion in its Infrastructure Surcharge, Spire organized the tasks performed under the blanket work orders into categories, and determined whether particular categories of tasks were eligible for inclusion in the surcharge. The Report and Order explained that

6

Tasks [performed under blanket work orders] that Spire Missouri considered ISRS eligible were mandated relocations, replacements due to leak repairs and corrosion inspections, and replacement of copper and cast iron pipe. ISRS ineligible items included relocations at a customer's request, replacements due to excavation damage, replacement of plastic not related to a leak repair, and installation of new services.

(Footnotes omitted.) The Report and Order noted that "Staff agreed with Spire Missouri's blanket work order task categorizations" and eligibility determinations, and that "Public Counsel also indicated several times through its attorney and witness at the hearing that it is not challenging the blanket work orders in this case." The Report and Order adopted Spire's recommended approach for costs incurred under blanket work orders.

Spire and OPC each appealed from the Commission's Report and Order. Their appeals were consolidated, and are both resolved by this opinion.

## Standard of Review

We review the Commission's order pursuant to § 386.510, RSMo Cum. Supp. 2019. Appellate review under § 386.510 is "two-pronged: first, the reviewing court must determine whether the [Commission]'s order is lawful; and second, the court must determine whether the order is reasonable." *In re Mo.-Am. Water Co.*, 516 S.W.3d 823, 827 (Mo. 2017) (citation and internal quotation marks omitted). "The [Commission]'s order is presumed valid, and the appellant has the burden of proving that the order is unlawful or unreasonable." *Id.* (citation omitted). Appellant must show the Commission's order is unlawful or unreasonable "by clear and satisfactory evidence." *In re Union Elec. Co.*, 422 S.W.3d 358, 364 (Mo. App. W.D. 2013).

"The lawfulness of an order is determined by whether the [Commission] had statutory authority to issue the order." *In re Rate Increase Request for Liberty Utils. (Mo. Water), LLC*, 592 S.W.3d 82, 87 (Mo. App. W.D. 2019) (citation and internal quotation marks omitted). We review the lawfulness of the Commission's order *de*

7

*novo. Id.* (citation omitted). The reasonableness of the Commission's order is determined by whether the order is "supported by substantial, competent evidence on the whole record; the decision is not arbitrary or capricious; and [whether] the Commission has . . . abused its discretion." *Spire I*, 539 S.W.3d at 838 (citation and internal quotation marks omitted).

"All factual findings of the Commission are presumed correct, and if substantial evidence supports either of two conflicting factual conclusions, the Court is bound by the findings of the administrative tribunal." *State ex rel. Aquila, Inc. v. Pub. Serv. Comm'n*, 326 S.W.3d 20, 22 (Mo. App. W.D. 2010) (citation and internal quotation marks omitted).

> The determination of witness credibility is left to the Commission, which is free to believe none, part, or all of the testimony. It is only where a Commission order is clearly contrary to the overwhelming weight of the evidence that we may set it aside. Additionally, with regard to issues within the Commission's expertise, we will not substitute our judgment for that of the Commission.

*In re Kansas City Power & Light Co.'s Request for Auth. to Implement a Gen. Rate Increase for Elec. Serv. v. Mo. Pub. Serv. Comm'n*, 509 S.W.3d 757, 764 (Mo. App. W.D. 2016) (citation and internal quotation marks omitted).

## Discussion

We first address Spire's challenges to the Commission's Report and Order, and then address the single Point raised in Public Counsel's cross-appeal.

## I.

Spire's first Point argues that the Commission's Report and Order is unlawful, because it failed to permit Spire to include in its Infrastructure Surcharge costs which Spire contends are statutorily eligible for such treatment. Because we conclude that the Commission could properly determine that Spire's cost studies did

not accurately identify its "costs for eligible infrastructure system replacements," § 393.1012.1,[2] we reject Spire's first Point.

## A.

We begin by describing the relevant statutory framework. As we discuss in § I.C below, the statutes governing gas utilities' use of Infrastructure Surcharges have been substantially amended, with an effective date of August 28, 2020. No party to this appeal argues that the 2020 statutory amendments should apply here. We therefore apply the statutes which were in effect at the time Spire incurred the costs at issue, and when the Commission determined the eligibility of those costs for inclusion in Spire's Infrastructure Surcharge.

As a general proposition,

> Utility rates are established periodically by proceedings before the PSC known colloquially within the industry as "rate cases." Rates are based on the amount of revenue necessary to build, maintain, and operate the utility plants and associated infrastructure (referred to as "rate base"), plus a reasonable rate of return for utility company investors. Unless otherwise provided for by law, [a regulated utility] is not permitted to adjust the rate it charges customers until its next rate case. Even if [the utility] found it necessary to build [new facilities] years before its next rate case, unless expressly permitted to by statute, it would not ordinarily be allowed to recoup its expense or earn profit on that capital investment in the interim. This phenomenon is referred to as "regulatory lag."

*Union Elec. Co. v. Mo. Pub. Serv. Comm'n*, 591 S.W.3d 478, 482 (Mo. App. W.D. 2019) (citation omitted).

The statutes authorizing Infrastructure Surcharges create an exception to this general ratemaking paradigm. Under § 393.1012.1, a gas utility is entitled to petition the Public Service Commission, independent of a general rate case, to establish an Infrastructure System Replacement Surcharge (or "ISRS") to be

---

[2] Unless otherwise indicated, statutory citations refer to the 2016 edition of the Revised Statutes of Missouri.

9

charged to consumers "to provide for the recovery of costs for eligible infrastructure system replacements." The utility may change the rate of the surcharge up to twice per year. § 393.1015.3. If the Commission determines that the utility's application complies with the relevant statutes, it "shall enter an order authorizing the corporation to impose an ISRS that is sufficient to recover appropriate pretax revenue" to recover its eligible infrastructure replacement costs. § 393.1015.2(4).

The relevant statutes provide that, in addressing a utility's petition to establish or change an Infrastructure Surcharge, "[n]o other revenue requirement or ratemaking issues may be examined." § 393.1015.2(2). The statutes specify that

> Commission approval of a petition, and any associated rate schedules, to establish or change an ISRS pursuant to the provisions of sections 393.1009 to 393.1015 shall in no way be binding upon the commission in determining the ratemaking treatment to be applied to eligible infrastructure system replacements during a subsequent general rate proceeding when the commission may undertake to review the prudence of such costs. In the event the commission disallows, during a subsequent general rate proceeding, recovery of costs associated with eligible infrastructure system replacements previously included in an ISRS, the gas corporation shall offset its ISRS in the future as necessary to recognize and account for any such overcollections.

§ 393.1015.8.

"Eligible infrastructure system replacements" are defined as

gas utility plant projects that:

    (a)    Do not increase revenues by directly connecting the infrastructure replacement to new customers;

    (b)    Are in service and used and useful;

    (c)    Were not included in the gas corporation's rate base in its most recent general rate case; and

    (d)    Replace or extend the useful life of an existing infrastructure.

§ 393.1009(3). "Gas utility plant projects" is defined in relevant part as "[m]ains, valves, service lines, regulator stations, vaults, and other pipeline system

10

components installed ***to comply with state or federal safety requirements as replacements for existing facilities that have worn out or are in deteriorated condition***." § 393.1009(5)(a) (emphasis added).

**B.**

This is not the first time that this Court has addressed the eligibility for inclusion in an Infrastructure Surcharge of costs incurred through Spire's strategic replacement program. In *Spire I*, 539 S.W.3d 835, we addressed Spire's effort to recover costs incurred between March 1 and October 31, 2016, through an Infrastructure Surcharge. We held that the Commission erred by permitting Spire to include in its surcharge the *entire cost* of replacing segments of its existing gas distribution system (including cast-iron, steel, and plastic pipes) as part of its strategic replacement program. We held that, under the plain language of § 393.1009(5)(a), costs incurred to replace plastic pipe which was not itself worn out or deteriorated, and which was not itself the subject of a governmental safety mandate, was not eligible for inclusion in an Infrastructure Surcharge. We emphasized that § 393.1009(5)(a) "clearly sets forth two requirements for component replacements to be eligible for cost recovery under ISRS: (1) the replaced components must be installed to comply with state or federal safety requirements and (2) the existing facilities being replaced must be worn out or in a deteriorated condition." 539 S.W.3d at 839.

In *Spire I*, the Commission had justified Spire's recovery of its entire strategic replacement program costs on the theory that the plastic components of the replaced system were "patches" which "constituted 'an integral component of the worn out and deteriorated cast iron and steel pipe.'" *Id.* We disagreed. We emphasized that the Missouri Supreme Court "has found this ['worn out or deteriorated'] requirement to be mandatory and has interpreted it narrowly." *Id.* "This effort to assign ISRS eligibility to plastic pipes that are not worn out or

11

deteriorated by evaluating an entire neighborhood system as a singular unit finds

no support in the plain language of section 393.1009(5)(a)." *Id.* (footnote omitted).

> We recognize that the replacement of worn out or deteriorated
> components will, at times, necessarily impact and require the
> replacement of nearby components that are not in a similar condition.
> Our conclusion here should not be construed to be a bar to ISRS
> eligibility for such replacement work that is truly incidental and
> specifically required to complete replacement of the worn out or
> deteriorated components. However, we do not believe that section
> 393.1009(5)(a) allows ISRS eligibility to be bootstrapped to components
> that are not worn out or deteriorated simply because that are
> interspersed within the same neighborhood system of such components
> being replaced or because a gas utility is using the need to replace
> worn out or deteriorated components as an opportunity to redesign a
> system (i.e., by changing the depth of the components or system
> pressure) which necessitates the replacement of additional
> components.

*Id.* at 839-40 n.5.

On remand from our decision in *Spire I*, Spire presented cost studies to the

Commission which it had performed on ten sample work orders. According to Spire,

those cost studies showed that, in nine of the ten projects it analyzed, the

replacement of plastic pipe as part of a neighborhood-wide project actually

*decreased* Spire's total cost, as compared to replacing only the metal components

and reusing the existing plastic piping. Spire therefore contended that, in the

majority of its strategic replacement projects, it had <u>no</u> plastic-related costs which

were ineligible for inclusion in its Infrastructure Surcharge. The Commission

declined to adopt Spire's approach. The Commission concluded that Spire had

analyzed "far too few work orders" to permit the Commission "to extrapolate from

those nine work orders and reach a similar result in the hundreds of work orders

that Spire Missouri did not analyze." *In re Application of Laclede Gas Co. to

Change its Infrastructure Sys. Replacement Surcharge*, GO-2016-0332 & GO-2016-

0333, 2018 WL 6724346, at \*9 (Mo. P.S.C. Sept. 20, 2018).

12

The Commission's 2018 remand order also explained that Spire's cost studies were simply "irrelevant" to the question presented in an Infrastructure Surcharge proceeding:

> [Spire's] argument improperly intermixes the issue of prudency, which is determined in a general rate proceeding, with eligibility, which is the appropriate determination in an ISRS proceeding. So, **Spire Missouri's arguments regarding prudency, cost avoidance, and economic efficiency are irrelevant** to the Commission's conclusion in these cases.

*Id.* (emphasis added).

Despite its statement that Spire's arguments concerning relative cost were "irrelevant," the Commission's 2018 remand order contained the following *dictum*:

> In the future, if Spire Missouri wishes to renew its argument that plastic pipe replacements result in no cost or a decreased cost of ISRS, it should submit supporting evidence to be considered, such as, but not limited to, a separate cost analysis for each project claimed, evidence that each patch was worn out or deteriorated, or evidence regarding the argument that any plastic pipe replaced was incidental to and required to be replaced in conjunction with the replacement of other worn out or deteriorated components.

2018 WL 6724346, at *10.

Ultimately, in the remand proceeding the Commission adopted a methodology proposed by Staff and Public Counsel to allocate project costs between the surcharge-eligible replacement of worn out or deteriorated metal pipe, and the replacement of ineligible plastic pipe. This methodology calculated the total length of main and service lines replaced on a particular project, determined the percentage of that total length consisting of plastic pipe, and then applied that percentage to the total project cost. *Id.*

Spire and Public Counsel appealed to this Court. In *"Spire II,"* we affirmed the Commission's rejection of Spire's incremental-cost arguments, and its reliance on a percentage methodology to allocate project costs between the surcharge-eligible and surcharge-ineligible components. *In re Application of Laclede Gas Co. to*

13

*Change its Infrastructure Sys. Replacement Surcharge v. Mo. Pub. Serv. Comm'n*, 593 S.W.3d 582 (Mo. App. W.D. 2019). We began our analysis by emphasizing that, "[a]s the party that filed the ISRS applications, Spire bore the burden of proof in this matter." *Id.* at 595 (citing § 393.150.2). *Spire II* found that the Commission, as fact-finder, was justified in rejecting Spire's cost studies on the basis that they reflected too small a sample size to be persuasive; we also noted that Spire had presented no evidence that any of the plastic components it replaced were themselves worn out or deteriorated, or that their replacement was incidental and required to complete the replacement of worn out or deteriorated components. *Id.* at 596.

We also found that, in the absence of any more probative evidence concerning the ineligible costs associated with the replacement of plastic components, the Commission was entitled to rely on the percentage methodology advocated by Staff and Public Counsel:

> We again stress that it was Spire's burden to prove that some or all of its plastic replacements were eligible for ISRS recovery. Spire chose to rest on its theory that no ISRS collections should have been disallowed because its replacement of ineligible plastics did not increase ISRS costs. The PSC found that this theory was not supported by sufficient data. Spire did not conduct a case-by-case review to determine exactly which of its plastic replacements involved components that were in fact worn out or deteriorated. The PSC was therefore precluded from taking a more nuanced approach to the disallowance issue than the percentage-based method advocated by the OPC and Staff. We cannot conclude that the PSC erred in determining that the percentage model constituted "the best evidence of a methodology to calculate the costs of th[e] ineligible plastic pipe replacements." Given the lack of evidence adduced by Spire, the percentage-based model was the only method the PSC could employ to calculate the cost of ISRS-ineligible replacements, and thereby calculate a disallowance in accordance with our opinion and mandate in *Spire I*. The PSC's calculation of Spire's ISRS disallowance was supported by substantial competent evidence and is not arbitrary or unreasonable.

593 S.W.3d at 597.

**C.**

In this proceeding, Spire does not dispute that costs which are attributable to its replacement of plastic components are not eligible for recovery through an Infrastructure Surcharge, since the plastic components are not themselves worn out or deteriorated, and no governmental safety mandate compels their replacement. Instead, Spire contends that it presented evidence that, on many of the replacement projects it conducted, there *was no* incremental cost associated with the replacement of plastic components. Spire argues that the Commission was therefore statutorily required to permit Spire to include the entire cost of those projects in its Infrastructure Surcharge.

On remand from our decision in *Spire I*, the Commission clearly stated its conclusion that "Spire Missouri's arguments regarding prudency, cost avoidance, and economic efficiency are irrelevant to the Commission's conclusion in" the expedited Infrastructure Surcharge proceedings contemplated by §§ 393.1009-393.1015. 2018 WL 6724346, at *9. It adhered to that decision in the Report and Order under review here.

The Commission's conclusion that Spire's incremental-cost analyses are not relevant in an Infrastructure Surcharge proceeding falls within its area of expertise, and is entitled to deference from this Court.

> Missouri courts have long recognized that when the decision involves the exercise of regulatory discretion, the PSC is delegated a large amount of discretion, and "many of its decisions necessarily rest largely in the exercise of a sound judgment." "Under these circumstances, the reviewing court will not substitute its judgment for that of the PSC on issues within the realm of the agency's expertise."

*State ex rel. Sprint Mo., Inc. v. Pub. Serv. Comm'n*, 165 S.W.3d 160, 164 (Mo. 2005) (citations omitted). This deference is applicable to decisions involving the establishment of utility rates: "The Commission has considerable discretion in rate setting due to the inherent complexities involved in the rate setting process." *State*

15

*ex rel. Praxair, Inc. v. Pub. Serv. Comm'n*, 328 S.W.3d 329, 339 (Mo. App. W.D. 2010) (quoting *State ex rel. Office of Pub. Counsel v. Pub. Serv. Comm'n*, 938 S.W.2d 339, 344 (Mo. App. W.D. 1997)). "Missouri courts long have recognized that 'ratemaking is not an exact science,' no methodology is statutorily prescribed or limited, and '[t]he complexities inherent in a rate[-]of[-]return determination necessarily require that the PSC be granted considerable discretion.'" *State ex rel. Office of Pub. Counsel v. Pub. Serv. Comm'n*, 367 S.W.3d 91, 108 (Mo. App. S.D. 2012) (citations omitted).

In *Spire II*, we applied these deferential review standards to the precise issue we face today. We emphasized that "'[t]his court will not substitute its judgment for that of the Commission,'" or "'second-guess issues that are within the [Commission]'s area of expertise,'" and that we would accordingly "afford deference to the [Commission]'s chosen methodology for calculating an ISRS disallowance." 593 S.W.3d at 596 (citations omitted).

The relevant statutes did not *require* the Commission to rely on Spire's incremental-cost analysis. The statutes specify that a utility may recover the "costs" of eligible infrastructure replacement projects through an Infrastructure Surcharge, without defining "costs," or specifying how the eligible "costs" should be determined. Section 393.1012.1 provides that a gas utility may seek Commission approval of an Infrastructure Surcharge "that will allow for the adjustment of the gas corporation's rates and charges to provide for the recovery of costs for eligible infrastructure system replacements." Similarly, § 393.1009(1)(a) and (c) provide that the "appropriate pretax revenues" to be collected through an Infrastructure Surcharge should provide for a rate of return on "the net original cost of eligible infrastructure system replacements," and for "[r]ecover[y] [of] all other ISRS costs."

The relevant statutes do not otherwise define the "costs" of eligible infrastructure replacements – thus giving the Public Service Commission

16

substantial discretion to select the appropriate method for determining the "costs" which may be included in an Infrastructure Surcharge.

> The fact is that without any better indication of meaning than the unadorned term, the word "cost" in [a statute], as in accounting generally, is "a chameleon," a "virtually meaningless" term. . . . [W]ords like "cost" "give ratesetting commissions broad methodological leeway; they say little about the 'method employed' to determine a particular rate."

*Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 500-01 (2002) (citations omitted). In *Verizon*, the Supreme Court of the United States held that use of the term "cost" in a statute governing telecommunications rates was "simply too protean" to require that a rate-setting agency consider historical investments in setting rates. *Id.* at 501.

The Supreme Court has also recognized that issues of cost-allocation – like the issue presented here – are discretionary determinations frequently delegated to expert administrative agencies like the PSC. In *National Association of Greeting Card Publishers v. U.S. Postal Service*, 462 U.S. 810 (1983), a statute specified that the Postal Rate Commission should set rates for different classes of mail based on "the requirement that each class of mail or type of mail service bear the direct and indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type." *Id.* at 814 n.3 (quoting relevant statute). The Supreme Court held that this statute did not mandate that the Rate Commission use any particular methodology to determine which costs were "attributable" to particular classes of mail, but that the Rate Commission instead had substantial discretion to choose how to allocate costs to different mail categories.

> The Court has observed that "[a]llocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science." Generally, the legislature leaves to the ratesetting agency the choice of methods by which to perform this

17

allocation, although if the statute provides a formula, the agency is bound to follow it.

> We agree with the Rate Commission's consistent position that Congress did not dictate a specific method for identifying causal relationships between costs and classes of mail, but that the Act "envisions consideration of all appropriate costing approaches." The Rate Commission has held that, regardless of method, the Act requires the establishment of a sufficient causal nexus before costs may be attributed. . . .

> . . . .

> [The relevant statute] requires that all "attributable costs" be borne by the responsible class. In determining what costs are "attributable," the Rate Commission is directed to look to all costs of the Postal Service, both "direct" and "indirect." In selecting the phrase "attributable costs," Congress avoided the use of any term of art in law or accounting. In the normal sense of the word, an "attributable" cost is a cost that may be considered to result from providing a particular class of service. On its face, there is no reason to suppose that [the statute] denies to the expert ratesetting agency, exercising its reasonable judgment, the authority to decide which methods sufficiently identify the requisite causal connection between particular services and particular costs.

462 U.S. at 825-27 (citations and footnotes omitted).

As the Supreme Court recognized, the word "cost" is a "chameleon," which can have multiple different meanings. On the one hand, several usages of the term "cost" focus – like Spire's cost studies – only on the *additional* increment of expense associated with adding an additional service or unit of production onto an existing activity. Terms like "incremental cost," "marginal cost," "differential cost," or "avoided cost" may seek to capture "cost" in this sense. On the other hand, other well-established usages of the term "cost" determine the "cost" of a particular activity by allocating to that activity a share of the total costs of the endeavor of which the specific activity is a part (both fixed or sunk costs, and variable costs). "Cost" in this sense may be reflected in terms like "total cost," "average cost," "full cost," or "absorbed/absorption cost."

18

In its 2018 remand order, and again in this case, the Public Service Commission has held that to determine the "costs" of plastic-pipe replacement which must be excluded from Spire's Infrastructure Surcharge, it is appropriate to allocate a share of the total costs of the neighborhood-wide replacement project in which the plastic-pipe replacement occurs. This is a well-established construction of the term "costs." The use of the term "costs" in the relevant statutes, without further definition or explanation, did not prevent the Commission from adopting this approach.[3]

Several considerations support the Commission's interpretation of the "costs" eligible for inclusion in an Infrastructure Surcharge. First, because the Infrastructure Surcharge mechanism is an exception to Missouri's general prohibition on "single-issue ratemaking," we held in *Spire I* that the statutory eligibility criteria are mandatory, and must be narrowly construed. 539 S.W.3d at 838, 839. This consideration justifies the Commission in rejecting Spire's incremental-cost analysis, since under Spire's analysis, it would be able to include in an Infrastructure Surcharge <u>all</u> of the costs of a project, even though that project included substantial replacement of ineligible plastic piping.

In *Spire I*, Spire argued that it was not appropriate to focus on whether particular plastic components were "worn out or deteriorated." Instead, it argued "that the specific condition of the replaced plastic components is not dispositive and

---

[3] Spire cites to the legislature's reference to "avoided costs" in § 393.1075.2(6), to argue that the Commission should have applied the same concept here. But § 393.1075.2(6) *explicitly* refers to "avoided costs," while the Infrastructure Surcharge statutes do not. *See McAlister v. Strohmeyer*, 395 S.W.3d 546, 552 (Mo. App. W.D. 2013) ("'It is a settled canon of statutory construction that, where different language is used in the same connection in different parts of an act, it is presumed that the legislative body intended different meaning and effect.'" (citation omitted)). Spire also cites to the Commission's regulations governing utility resource planning, 20 CSR 4240-22.010 to -22.080, which rely on avoided-cost principles. But the fact that avoided-cost concepts may be well-suited to forward-looking managerial decisionmaking does not mean that the Commission was required to use those same principles in this very different rate-setting context.

that ISRS-eligibility should be determined based on the condition of the entire neighborhood system." 539 S.W.3d at 839. We disagreed, finding that Spire's "effort to assign ISRS eligibility to plastic pipes that are not worn out or deteriorated by evaluating an entire neighborhood system as a singular unit finds no support in the plain language of section 393.1009(5)(a)." *Id.* Spire's incremental-cost analyses essentially engage in the same "bootstrapping" as the arguments we rejected in *Spire I*. Spire's cost analyses focus on the aggregate cost of replacing "an entire neighborhood system as a singular unit," rather than seeking to identify and isolate the cost of replacement of the plastic components themselves. As explained in the Public Service Commission's Brief, Spire's incremental-cost analysis "proceeds from an assumption that the entire cost to replace whole neighborhoods can be attributed to the replacement of cast iron and steel" – even though substantial quantities of ineligible plastic piping was replaced as part of the same project. Spire seeks to resurrect an argument we rejected in *Spire I*.[4]

One of Spire's own witnesses acknowledged that some "cost" is "inherent" in the replacement of plastic piping, even in projects where there was no *incremental* cost to replacing the plastic piping at the same time as metal piping.

> Q. Okay. And let me look here. And are you in agreement with what Mr. Pendergast said earlier, that basically the – the ISRS costs that the Company is trying to recover don't include a cost for the plastic because it would have cost more if you had not replaced it – the plastic?

---

[4] In *Spire I*, the Commission had concluded that it was unnecessary to allocate <u>any</u> cost to the replacement of plastic pipes as part of Spire's strategic replacement program, on the theory that the plastic piping constituted "an integral component" of a neighborhood-wide distribution network which also included worn out or deteriorated metal pipe. 539 S.W.3d at 839. We held that, under § 393.1009(5)(a), it was inappropriate to "evaluat[e] an entire neighborhood system as a singular unit"; instead, the statute required that the particular components being replaced satisfy the statutory eligibility criteria. *Id.* at 839-40 & n.5. *Spire I* did not involve the Commission's selection of a cost-allocation methodology, but instead its refusal to conduct any cost-allocation whatsoever, based on an erroneous interpretation of the governing law.

A. Well, there is a cost inherent to – you know, to replacing all the pipe that's involved in that. ***So there's a cost involved with the plastic.*** But what we're saying is that it is, in most cases, cheaper to replace it then what it would have cost us to re-use that plastic so there's an avoided cost. ***Not that there's no cost, but it's – it's a less cost than it would be to re-use it***.

(Emphasis added.)

While Spire's incremental-cost analysis may be relevant in a later rate case, the Commission could rightfully determine that it was not the appropriate analysis in the current proceeding. As the Commission recognized in its 2018 remand order, consideration of incremental or marginal costs may be relevant in determining whether Spire acted prudently in replacing plastic piping (which was not itself worn out or deteriorated, and had remaining useful life) at the same time that it replaced the worn out or deteriorated metal pipe. But such prudence issues are not implicated in this Infrastructure Surcharge proceeding: the relevant statutes specify that "[n]o other . . . ratemaking issues may be examined," in a proceeding to approve a change to an Infrastructure Surcharge, § 393.1015.2(2), and that the approval of an Infrastructure Surcharge "shall in no way be binding upon the commission . . . during a subsequent general rate proceeding when the commission may undertake to review the prudence of such costs." § 393.1015.8.

Finally, we note that in its most recent session, the General Assembly enacted amendments to the Infrastructure Surcharge statutes which adopt the result for which Spire is advocating. House Bill 2120, 100th General Assembly, 1st Regular Session (2020), amends the definition of "gas utility plant projects" in § 393.1009(5), to include

any cast iron or steel facilities including any connected or associated facilities that, regardless of their material, age, or condition, are replaced as part of a qualifying replacement project in a manner that adds no incremental cost to a project compared to tying into or reusing existing facilities.

21

Under this amendment, which became effective on August 28, 2020, the cost of replacing "connected or associated facilities" may be recoverable under an Infrastructure Surcharge, without regard to whether the replaced piping is itself worn out or deteriorated.

> [I]n enacting a new statute on the same subject as that of an existing statute, it is ordinarily the intent of the legislature to effect some change in the existing law. "If this were not so the legislature would be accomplishing nothing, and legislatures are not presumed to have intended a useless act."

*State ex rel. Edu-Dyne Sys., Inc. v. Trout*, 781 S.W.2d 84, 86 (Mo. 1989) (citing and quoting *Kilbane v. Dir. of Dep't of Revenue*, 544 S.W.2d 9, 11 (Mo. 1976)); *see also*, *e.g.*, *State ex rel. Office of Pub. Counsel v. Mo. Pub. Serv. Comm'n*, 331 S.W.3d 677, 690 (Mo. App. W.D. 2011). We recognize that a later statutory enactment may not always be a reliable guide to the interpretation of the pre-amendment statute.[5] Nevertheless, the General Assembly's amendment to the definition of "gas utility plant projects" provides some additional support for our conclusion that, prior to this amendment, the Commission was not <u>*required*</u> to accept Spire's incremental-cost analysis.

Point I is denied.

## II.

Spire's second and third Points argue that the Commission's rejection of its incremental-cost studies, and its decision to instead use the percentage methodology

---

[5]     Although the Supreme Court's decision in *Edu-Dyne System* states that the purpose of a statutory amendment is "ordinarily" to change existing law, other cases recognize that, "'[w]hile an amendment to a statute must be deemed to have been intended to accomplish some purpose, that purpose can be clarification rather than a change in existing law.'" *State ex rel. Outcom, Inc. v. City of Peculiar*, 350 S.W.3d 57, 65 (Mo. App. W.D. 2011) (quoting *Andresen v. Bd. of Regents of Mo. W. Coll.*, 58 S.W.3d 581, 589 (Mo. App. W.D. 2001)); *accord*, *Self v. Midwest Orthopedics Foot & Ankle, P.C.*, 272 S.W.3d 364, 370 (Mo. App. W.D. 2008).

to identify surcharge-ineligible costs, was not supported by competent and substantial evidence, and was arbitrary, capricious, or unreasonable.

In large measure, Spire's second and third Points repeat many of the arguments which we have addressed in § I, above. Spire also argues in both Points that the Commission's decision should be reversed because, in preparing and submitting its 509 cost studies, Spire "kept faith with the explicit guidance given by the PSC" in the 2018 remand order, and followed the "evidentiary roadmap" specified by the Commission. Spire goes so far as to claim that "[t]he 2018 Order identified no flaws in Spire's cost analyses; to the contrary, rather than criticizing these studies, the PSC wanted **more** of them, i.e., one for each project." Spire argues that the Commission "pulled the rug out from under" Spire after it dutifully followed the Commission's directions, and that the Report and Order constitutes "a complete repudiation of the guidance [the Commission] had given the parties in the 2018 order."

This argument rests on a highly selective reading of the Commission's 2018 remand order. As we described above, the Commission's order on remand from our *Spire I* decision explicitly stated that the focus on incremental costs in Spire's cost studies was "irrelevant" to the cost-allocation issues involved in an Infrastructure Surcharge proceeding:

> [Spire's] argument improperly intermixes the issue of prudency, which is determined in a general rate proceeding, with eligibility, which is the appropriate determination in an ISRS proceeding. So, ***Spire Missouri's arguments regarding prudency, cost avoidance, and economic efficiency are irrelevant*** to the Commission's conclusion in these cases.

2018 WL 6724346, at *9 (emphasis added). As we recognized in *Spire II*, in its 2018 remand order the Commission found "that Spire had not even attempted to quantify its ISRS costs attributable to the replacement of plastic components that were not worn out or deteriorated, despite our previous holding that those costs were not

ISRS-eligible." 593 S.W.3d at 596. While the remand order may also have offered suggestions to Spire as to how it might make its cost studies more persuasive in a future proceeding, Spire cannot plausibly argue that the Commission explicitly endorsed its incremental-cost approach. We see no inconsistency – much less an inconsistency that would warrant reversal – between the Commission's 2018 remand order, and the Report and Order now under review.

Spire also argues at some length that the Commission acted without substantial supporting evidence, and in an arbitrary and capricious manner, when it determined the plastic-related costs which it would exclude from Spire's Infrastructure Surcharge using the percentage method. We have explained above that the Commission acted within its authority in rejecting Spire's incremental-cost-based analysis. Having rejected Spire's cost studies, the Commission found itself in precisely the same position as in *Spire II*. As in *Spire II*, the percentage methodology offered the only reasonably available method to determine the share of the costs of Spire's strategic replacement projects to allocate to the replacement of plastic piping.

As we explained in *Spire II*, "it was Spire's burden to prove that some or all of its plastic replacements were eligible for ISRS recovery." 593 S.W.3d at 597. Because of Spire's reliance on an incremental-cost analysis which the Commission properly rejected,

> [t]he PSC was therefore precluded from taking a more nuanced
> approach to the disallowance issue than the percentage-based method
> advocated by the OPC and Staff. We cannot conclude that the PSC
> erred in determining that the percentage model constituted "the best
> evidence of a methodology to calculate the costs of th[e] ineligible
> plastic pipe replacements." Given the lack of [*competent*] evidence
> adduced by Spire, the percentage-based model was the only method the
> PSC could employ to calculate the cost of ISRS-ineligible replacements,
> and thereby calculate a disallowance in accordance with our opinion
> and mandate in *Spire I*. The PSC's calculation of Spire's ISRS

disallowance was supported by substantial competent evidence and is not arbitrary or unreasonable.

593 S.W.3d at 597.[6]

## III.

Finally, Spire's fourth Point argues that the Commission erroneously concluded that it had no jurisdiction over Spire's request to recover additional costs for the October 2017 to June 2018 period which were not previously recovered in an earlier Infrastructure Surcharge case.

In Spire's January 2019 applications, it requested to recover costs through its Infrastructure Surcharge which it had incurred in two different time periods: (1) October 1, 2017, through June 30, 2018; and (2) July 1, 2018, through January 31, 2019. Spire had previously requested to recover the costs from the October 2017 through June 2018 time period in an earlier Infrastructure Surcharge proceeding. In that earlier proceeding the Commission followed the approach from the 2018 remand order, and rejected Spire's incremental cost analyses; instead, the Commission excluded certain of Spire's claimed costs using the percentage-based analysis which we upheld in *Spire II*. *In re Application of Spire Mo. Inc. to Change its Infrastructure Sys. Replacement Surcharge in its Spire Mo. E. Serv. Territory*, Nos. GO-2018-0309 & -0310, 2018 WL 6724358, at \*12 (Mo. P.S.C. Sept. 20, 2018). The Commission's decision in the earlier proceeding was pending on appeal at the time of Spire's January 2019 applications, *see* Nos. WD82303 and WD82373, and ultimately resulted in our decision in *Matter of Application of Spire Missouri Inc. to Change its Infrastructure System Replacement Surcharge in its Spire Missouri East*

---

[6] At various points in its briefing, Spire complains that a percentage-based cost allocation was only performed by Staff *after* the evidentiary hearings in this case, and in response to the Commission's request. While this may have been an unusual procedure, Spire was given an opportunity to respond to the percentage-based cost analysis prepared by Staff, and told the Commission that it had no objection to the accuracy of Staff's implementation of the percentage-based approach. Spire makes no argument that the Commission was somehow legally precluded from proceeding in the fashion it did, or that the procedures employed by the Commission could themselves somehow justify reversal.

*Service Territory v. Office of Public Counsel*, 593 S.W.3d 546 (Mo. App. W.D. Nov. 19, 2019).

Spire's January 2019 applications again sought to recover costs it had incurred between October 2017 and June 2018, "to the extent such costs were not recovered in the Company's immediately preceding ISRS proceedings . . . because of what the Commission deemed to be insufficient evidence demonstrating their eligibility." Spire asserted in its applications that it "has now corrected this deficiency using the roadmap for demonstrating eligibility provided by the Commission in" the 2018 remand order, and repeated in its later order addressing the 2017-18 costs. In its briefing to this Court, Spire asserts that, in the current proceeding, it submitted to the Commission incremental-cost studies for each of "the projects that had been subjected to the percentage method in the 2018 Case."

In its Report and Order, the Commission dismissed the portions of Spire's January 2019 applications concerning costs incurred between October 2017 and June 2018. The Commission found that it lacked jurisdiction to reconsider the surcharge-eligibility of these costs, while its earlier decision addressing those same costs was pending on appeal to this Court.

Spire argues that the Commission erred as a matter of law in concluding that it had no jurisdiction to consider Spire's new evidence concerning the costs it had incurred between October 2017 and June 2018. It is unnecessary for us to address this jurisdictional issue, however. Even if the Commission had *jurisdiction* to consider new evidence concerning the October 2017 to June 2018 costs, we have held in § I above that the Commission properly rejected Spire's incremental-cost-based analyses, and instead determined the amount of ineligible plastic-related costs using a percentage-of-total-length methodology. Even if the Commission had concluded that it had *jurisdiction* to reconsider its treatment of the October 2017 to June 2018 costs, it had *already* applied the percentage-based methodology to those

costs. Spire has shown no basis to justify a different treatment of the October 2017 to June 2018 costs, even if the Commission had jurisdiction to reconsider the issue.[7]

Point IV is denied.

## IV.

Finally, we turn to the single Point raised by the Office of Public Counsel in its cross-appeal. Public Counsel argues that the Commission erroneously allowed Spire to include in its Infrastructure Surcharge costs which it incurred under blanket work orders, but which were related to plastic components which were not worn out or deteriorated.

Blanket work orders are general work orders covering a large variety of tasks which are not planned replacement projects. (Thus, blanket work orders do not govern the neighborhood-wide projects performed under Spire's systematic replacement program.) Spire's January 2019 applications divided the tasks performed under blanket work orders into categories, and asserted that the cost of tasks in certain categories were eligible for recovery through its Infrastructure Surcharge. The surcharge-eligible tasks included: mandated relocations of gas distribution infrastructure; replacements as a result of leak repairs and corrosion

---

[7]    Spire argues in its Brief that, even if we find that the Commission properly applied a percentage-based methodology to costs incurred as part of Spire's strategic replacement program, a live issue still remains concerning the costs Spire incurred between October 2017 and June 2018: the treatment of costs Spire incurred under blanket work orders (a subject we discuss in greater detail in § IV, below). Spire argues that, in its prior order, the Commission applied a percentage-based allocation methodology to costs incurred under blanket work orders, but that Spire now seeks to have the Commission apply a task-based allocation method to those costs. As noted in the text, however, Spire's January 2019 applications sought to apply "the roadmap for demonstrating eligibility" first described by the Commission in the 2018 remand order, to the costs Spire had incurred between October 2017 and June 2018. That "roadmap" did not involve a task-based allocation of costs incurred under blanket work orders. *See* 2018 remand order, 2018 WL 6724346, at *5 ¶ 19 (noting that Staff applied percentage-of-total-length methodology to costs incurred under blanket work orders); *see also* 2018 WL 6724358, at *6 ¶ 22 (noting that Staff applied the same analysis to costs incurred between October 2017 and June 2018). We do not read Spire's January 2019 applications as seeking to apply a task-based allocation methodology to costs incurred under blanket work orders between October 2017 and June 2018.

27

inspections; and the replacement of copper and cast-iron pipe. Tasks which Spire acknowledged were not surcharge-eligible included: relocations at a customer's request; replacements following excavation damage; replacement of plastic components not related to leak repair; and installation of new service.

The PSC's Staff agreed with Spire's task-based approach, and with its categorization of tasks as surcharge-eligible and -ineligible. To calculate the blanket work order costs to be included in Spire's Infrastructure Surcharge, Staff included 100% of the cost for surcharge-eligible tasks, and none of the costs of ineligible tasks. Staff did so by calculating the percentage of ineligible tasks performed under Spire's blanket work orders, and then applying that percentage to the total blanket work order costs.

In its Report and Order, the Commission noted that the Office of Public Counsel "indicated several times . . . that it is not challenging the blanket work orders in this case," and that Public Counsel stated in its brief and in a recent filing "that it was choosing not to pursue this issue." Thus, the Commission concluded "[t]here is agreement that the gas utility plant contained in Spire Missouri's blanket work orders and its work orders for relocations may be considered ISRS eligible for purposes of this case."

In its cross-appeal, Public Counsel argues that the Commission's Report and Order improperly permits recovery for surcharge-ineligible costs incurred under Spire's blanket work orders. Although not entirely clear, it appears that Public Counsel challenges the use of a percentage-based methodology based on _the number of ineligible tasks performed_ under a blanket work order, rather than based on the relative _magnitude_ of the eligible and ineligible tasks (*i.e.*, the amount of eligible and ineligible piping replaced under the blanket work orders).[8] To support this

---

[8] As discussed in footnote 7, above, in prior proceedings the Commission applied a percentage-of-total-length methodology to allocate the costs of tasks performed

28

argument, Public Counsel argues that the Commission erroneously permitted Spire to recover the cost of "service[-line] renewals" in its Infrastructure Surcharge. Specifically, it argues that it has identified ineligible service-line renewals within the blanket work order costs which the Commission permitted Spire to recover.

We see several flaws in Public Counsel's argument. First, although not argued by Spire or by the Commission itself, we note that the Report and Order states, on multiple occasions, that Public Counsel was "not challenging the blanket work orders in this case." Although no other party argues that Public Counsel failed to preserve this issue, we seriously question whether it has standing to challenge the Commission's treatment of costs incurred under blanket work orders, when it apparently chose not to challenge that issue before the Commission itself.

Even if the issue were preserved, however, Public Counsel has failed to satisfy its burden to establish error. In the Report and Order, the Commission states that "[a] 'service renewal occurs when an existing service line is replaced in its entirety with a new service line.' Service renewals could be done at either the request of the customer **_or in the course of a leak repair_**." (Emphasis added; footnotes omitted.) Thus, according to the Report and Order, service-line renewals can be performed _either_ at a customer's request, _or_ in repairing a leak. The Report and Order also states that Spire and Staff indicated that the _only_ blanket work order costs for replacing plastic pipes which were included in Spire's Infrastructure Surcharge were the costs for "replacements due to leak repairs"; the Report and

under blanket work orders. But the Commission's orders in the prior cases indicate that documentation was not available to determine the relative length of plastic and metal pipe actually replaced under the blanket work orders themselves. _See_ 2018 remand order, 2018 WL 6724346, at *5 ¶ 19; 2018 WL 6724346, at *5 ¶ 18, *6 ¶ 22. Instead, Staff took the relative percentages that it developed in reviewing the work performed as part of Spire's strategic replacement program, and simply applied the same percentages to the blanket work order costs. _Id._ Public Counsel's briefing does not make clear whether (unlike in the prior cases) adequate documentation existed in this case to actually calculate the relative lengths of plastic and metal pipe replaced under Spire's blanket work orders.

29

Order specifically states that "replacement of plastic not related to leak repair" was treated as an *ineligible* task, and that its cost was *excluded* from the surcharge.

Public Counsel's Brief proceeds on the assumption that the costs of <u>all</u> service-line renewals are ineligible for inclusion in an Infrastructure Surcharge. Its Brief fails to address the Report and Order's findings that service-line renewals can be occasioned by both eligible and ineligible circumstances, and that only the costs for plastic-pipe replacement *related to leak repairs* were included in Spire's Infrastructure Surcharge. Notably, Public Counsel concedes in its Brief that it does "not challeng[e] the ISRS eligibility of" costs incurred under blanket work orders for "such things as leak repairs" – yet these appear to be the only plastic-related blanket work order costs which *were* included in Spire's surcharge.

In light of Public Counsel's failure to challenge the Commission's findings that it excluded the cost of ineligible plastic-pipe replacement under blanket work orders from the Infrastructure Surcharge, we reject Public Counsel's cross-appeal Point without further discussion.[9]

**Conclusion**

The Commission's Report and Order is affirmed.

_____
Alok Ahuja, Judge

All concur.

---

[9]    Spire filed a motion to strike portions of Public Counsel's brief. That motion is denied.